IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

| | |
|---|---|
| TIMOTHY NOLL, individually and on Behalf of all similarly situated individuals,<br><br>                Plaintiff,<br><br>v.<br><br>FLOWERS FOODS, INC., LEPAGE BAKERIES PARK STREET LLC, and CK SALES CO., LLC,<br><br>                Defendants. | Civil Action No. 1:15-cv-00493-JAW |

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
WITH INCORPORATED MEMORANDUM OF LAW**

B0090175.18

## TABLE OF CONTENTS

PAGE

I.  STATEMENT OF UNDISPUTED MATERIAL FACTS ................................................ 2

    A.  Defendants' Bakery Business and Independent Distributor Model ....................... 2

    B.  Distributors Contract for the Purpose of Making Sales
        in Their Territories ............................................................................................... 3

    C.  Distributors' Efforts Are Focused on Making and Increasing Sales ....................... 3

    D.  Distributors Are Regularly Engaged Away From Defendants' Place
        of Business And Distributors Structure Their Day in Accordance with
        Their Businesses' Needs ....................................................................................... 5

    E.  Lepage Bakeries and Other Out of State Bakeries Bake Products To
        Order And Ship Them In Interstate Commerce ..................................................... 5

    F.  Distributors Pack For Distribution and Distribute Perishable Foods .................... 7

    G.  Plaintiff Stephen Temm's Claims Are Judicially Estopped .................................. 8

    H.  Plaintiff Daryle Degen's Claims Have Been Released ......................................... 9

II.  LEGAL STANDARD ........................................................................................... 10

III.  ARGUMENT ....................................................................................................... 10

    RULE 23 CLASS STATE LAW CLAIMS .................................................................. 10

    A.  Defendants Are Entitled to Judgment As A Matter Of Law On Overtime
        Claims Set out in Count IV, Pursuant To Maine's Perishable Food
        Exemption; Maine's Outside Sales Exemption; and The Motor Carrier
        Act Exemption .................................................................................................... 10

        1.  Maine's Perishable Food Exemption (Count IV- Rule 23 Class) ............... 11

            a.  The pre-2017 Amendment Interpretation Entitles Defendants
                to Summary Judgment ....................................................................... 12

                i.   Packing for Shipment ............................................................... 12
                ii.  Packing for Distribution ........................................................... 13

            b.  The 2017 Amendment Also Entitles Defendants to Summary
                Judgment .......................................................................................... 15

i.    The Court Is Obliged To Apply The Law As Intended By The Legislature ...................................................... 16

ii.   The 2017 Amendment Clarification Does Not Implicate Retroactivity ............................................................ 17

iii.  If The Pending Case Exception To Retroactivity Is Applied To This Case, Such Application is Unconstitutional ................ 18

2.   The Motor Carrier Act Exemption (Count IV- Rule 23 Class) .................... 20

     a.   Interstate Commerce ...................................................... 21

     b.   Vehicles Weighing At Least 10,001 Pounds ....................................... 26

3.   Maine's Outside Sales Exemption (Count IV- Rule 23 Class) .................... 28

B.   Plaintiffs have no private right of action to pursue Count III (Misclassification under 26 M.R.S.A.§ 591-A and § 1043(11)) or that Portion of Count IV asserting a claimed failure to maintain accurate records under 26 M.R.S. § 622 ................................................................................ 31

C.   The FAAAA Preempts Factor Eight Of Maine's Common Law Test ................. 33

D.   Class Member Degen's Claims Must Be Dismissed Pursuant To A Valid And Enforceable Release .................................................................... 34

FLSA COLLECTIVE CLAIM ...................................................................... 34

E.   Defendants Are Entitled to Judgment As A Matter Of Law On Count I (FLSA Overtime Claim) As Plaintiffs Are Exempt from Overtime, Pursuant To the Motor Carrier Act and Outside Sales Exemptions ..................... 34

1.   MCA Exemption (Count I Opt-In Plaintiffs) .................................... 35

2.   The FLSA Outside Sales Exemption (Count I-Opt-In Plaintiffs) ............... 35

     a.   A Distributor's Primary Duty Is Making Sales ................................... 36

     b.   Distributors Are Customarily And Regularly Engaged Outside of The Warehouses ...................................................................... 38

F.   Opt-In Plaintiff Temm's Claims Are Judicially Estopped ..................... 39

CONCLUSION ........................................................................................ 40

## DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
## WITH INCORPORATED MEMORANDUM OF LAW

Defendants Lepage Bakeries Park Street, LLC, CK Sales Co., LLC, and Flowers Foods, Inc. file this Motion for Partial Summary Judgment with Incorporated Memorandum of Law.

With regard to Plaintiff's Rule 23 class claims, Defendants seek summary judgment on Plaintiffs' claim for overtime under state law (part of Count IV). If a jury found Plaintiffs to be employees under state law, Maine's Perishable Foods overtime exemption (26 M.R.S.A. §664(3)(F)), Maine's Motor Carrier Act overtime exemption and Maine's outside sales exemption each precludes recovery of overtime. In addition, there is no private right of action to assert claims under 26 M.R.S.A §591-A (misclassification of employees), 26 M.R.S.A. § 1043(11)(definition of employment under Maine's unemployment compensation laws) or 26 M.R.S.A. §622 (accurate record keeping obligation). Accordingly, Defendants seek summary judgment (and/or dismissal with prejudice) of Count III in its entirety and that part of Count IV involving 26 M.R.S.A. §622.

With regard to Plaintiff's FLSA collective action, Defendants likewise seek summary judgment on Plaintiff's claim for overtime (Count I) as both the Motor Carrier Act overtime exemption (29 U.S.C. §213(b)(1)) and the outside sales exemption (section 3(k) of FLSA) preclude Plaintiffs from recovering overtime even if Plaintiffs were to prevail on their independent contractor misclassification claim, which Defendants deny would be appropriate.

Finally, two plaintiffs must be dismissed from this litigation and judgment entered for Defendants. Opt-in Plaintiff Temm filed for bankruptcy so he is judicially estopped from asserting claims as part of the FLSA collective class or the Rule 23 state law class. Class Member Degen

provided a full release of all claims and furthermore, the Court dismissed him as a collective opt-in plaintiff due to his failure to respond to discovery and thus his claims are barred.[1]

## I.   STATEMENT OF UNDISPUTED MATERIAL FACTS

**A.   Defendants' Bakery Business and Independent Distributor Model**

Lepage Bakeries Park Street, LLC ("Lepage Bakeries") has been in business since 1903 and is a wholly-owned subsidiary of Flowers Foods, Inc. ("Flowers Foods"), since its acquisition in 2012. *See SOMF ¶1.* In the fall of 2013, Lepage Bakeries' wholly-owned subsidiary, CK Sales Co., LLC ("CK Sales"), began selling franchised distribution rights to independent businesses throughout New England and New York pursuant to the terms of a Distributor Agreement. *See SOMF ¶2.* Plaintiffs are Distributors who entered into Distributor Agreements with CK Sales. *See SOMF ¶3.*

The distribution rights that Distributors acquire through their companies under the Distributor Agreements provide the Distributors' businesses with the exclusive right to sell and distribute different branded products, such as fresh breads, buns, rolls, snack cakes, and pastries to customers in defined geographic territories. *See SOMF ¶4.* Pursuant to the Distributor Agreement, Lepage Bakeries sells products to the Distributors' companies for resale to those companies' customers. *See SOMF ¶5.* Distributors' companies generate a profit based on the difference between the price for which the corporation sells products and the price for which the corporation purchases those products, less business expenses. *See SOMF ¶6.* Distributors choose whether to personally service their territories, and their companies are free to hire or engage any individuals of their choosing to perform the obligations under the Distributor Agreement. *See SOMF ¶7.* Some distributorships own multiple territories and engage full-time individuals to operate the territories. *Id.* Some are operated by the majority owner *(Id.)* and some of the owner-operated distributorships engage individuals on a part-

---

[1] Plaintiffs' counsel has informed Defendants that they are no longer pursuing claims under Count V (contract rescission and *quantum meruit* damages). Defendants seeks dismissal of Count V by consent of the parties.  Absent Plaintiffs' decision Defendants would have moved for summary judgment on those counts.

time basis to assist with various aspects of the business. *Id.* Regardless of the business approach, each Distributor, not the Defendants, determines the number of and the hours worked by individuals engaged in their distributorships, including start times, and total hours worked. *Id.*

**B.      Distributors Contract for the Purpose of Making Sales in Their Territories**

Under the Distributor Agreements, the Distributors' businesses have contracted for the right to sell various products within their territories. *See SOMF ¶8*. Distributors' earnings from their businesses are directly attributable to the sale of these products. *See SOMF ¶9*. Generally speaking, the more products a Distributor's business sells, the more money the business can make. *See SOMF ¶10*. Distributors purchase a variety of products from Lepage Bakeries at a specified discount, which they sell and market to their customers and potential customers in their respective territories. *See SOMF ¶11*. Distributors determine which products to order for their customers based on their customers' individual needs. *See SOMF ¶12*.

**C.      Distributors' Efforts Are Focused on Making and Increasing Sales**

When Distributor Noll had a new product, he would try to develop that brand in his territory: "Some didn't sell as well as others, but that didn't stop [him] from trying." He would also ask accounts if they had additional space or display area to try to increase sales. *See SOMF ¶13*.

Distributor Dore "definitely" wants to increase his sales and has been able to grow his sales and shelf space by providing excellent customer service; he has also taken an account representative out for lunch and donates products from his company at the holidays or for his customer's employee appreciation barbecues, in an effort to maintain good relations with the customer. He takes opportunities to gain additional displays and will take advantage of a competitor's empty shelf space by asking permission from the manager to stock his product there instead. *See SOMF ¶14*. Dore also considers himself to be the dominant bread distributor in his area and is well-known in his small town: he has picked up new accounts by people approaching him to ask about his pricing. *See SOMF ¶20*.

Distributor Swedberg's business has grown since he acquired distribution rights due to increased sales; he has initiated his own sales incentives with some chain accounts, including promotions on sub rolls and bulky rolls at one account, and another promotion on TastyKake that he was working on at the time of deposition. He has also been successful in obtaining extra shelf space and displays at many of his accounts by speaking with the store managers. ***See SOMF ¶15***.

Distributor Burns tries to maximize sales in his territory and states that sales at his Sam's Club account are up 30% because he was able to get new items into the store, like double packs of butter bread and honey wheat: "[H]e had to pester them for quite some time . . . [h]e showed them how a lot of their employees that worked there were buying the bread as single units at Walmart, and they went to bat and said we should have it in here; we're losing sales.  So . . . the general manager fought to get it in there." ***See SOMF ¶16***.

Distributor Lucey tries "every day" to increase sales in his territory: "[m]y idea of the best way is good ordering. If you can nail the orders . . . [y]ou can make more money." ***See SOMF*** ¶17. Lucey has tried to increase the number of customers he has in his territory, and has been successful in doing so; he added a restaurant and he added a market by talking to the owner, who shopped at his Hannaford's account. ***See SOMF ¶22***.

Distributor Curran talks to store managers about putting his product in where a competitor is leaving shelf space empty: "you're always – you're trying to get as much as you can, different stops." ***See SOMF ¶18***.

Distributor Landry has tried to get additional shelf space from all of his customers: "[He]'ll try to push the product as much as [he] can anywhere [he] can." ***See SOMF ¶19***.

Distributor Veilleux's business has increased in his territory since hiring his son to assist in operating the distributorship, which has allowed him more time to do a better job and acquire more accounts: "[I]f you're not overtired, you're gonna do a better job and do more . . . .  And you're not

afraid to pick up new accounts. . . . we picked up [three new accounts], so those have helped my numbers." *See SOMF ¶21*.

**D.      Distributors Are Regularly Engaged Away From Defendants' Place of Business And Distributors Structure Their Day in Accordance with Their Businesses' Needs**

Lepage Bakeries has warehouses throughout Maine. Each Distributor's business has an affiliated warehouse. *See SOMF ¶23*. For Distributors who personally service their territories, on delivery days (Monday, Tuesday, Thursday, Friday, Saturday) Distributors start their day by packing the product each ordered onto their trucks at the warehouse, and usually return to the warehouse at the end of the day to unload their trucks (trays) and process stales (being sold back to Lepage Bakeries). Distributors spend the rest of their day in their territories selling and distributing the product to customers and potential customers in their territories, outside and away from any of Lepage Bakeries' warehouses. *See SOMF ¶25.* As examples, on delivery days, Distributor Landry starts his day at about 4:00 AM, based on his customers' service needs. Distributor Curran delivers to his customer accounts five days per week; his longer days are Mondays and Fridays; he does recalls on Wednesdays and Sundays to pull product up from the back room. Distributor Dore makes his own distribution schedule during the day, he just needs to deliver to certain accounts by a certain time in accordance with customer requirements. *See SOMF ¶25*. On non-delivery days (Sundays and Wednesdays), Distributors typically drive directly from their homes to certain customer accounts to merchandise product (referred to as "recalls" or "pull-ups"). *Id.*

**E.      Lepage Bakeries and Other Out of State Bakeries Bake Products To Order And Ship Them In Interstate Commerce**

Lepage Bakeries is registered with the U.S. Department of Transportation ("DOT") as a Motor Private Carrier, with DOT Number 94424. *See SOMF ¶26*. Lepage Bakeries and Flowers Foods' out-of-state subsidiary bakeries produce products in response to the specific orders placed by Distributors' businesses. *See SOMF ¶27*. While some products are/were produced at the two bakeries in Maine,

many of the products ordered by the Distributors' businesses are produced by bakeries outside of Maine, including but not limited to the products branded Country Kitchen, Barowsky's, Nature's Own, Wonder Bread, and TastyKake. *See SOMF ¶28*. Once the Distributors' businesses order these products, the orders are transmitted to the applicable in-state or out-of-state bakeries, which in turn bake the ordered products and then ship them to Lepage Bakeries. *See SOMF ¶29*.

Once received by Lepage Bakeries, the bakery immediately trans-ships such products to the Distributors' businesses at their designated warehouses. *See SOMF ¶30*. Within hours, the Distributors' businesses then receive their orders, sell and deliver the products to the customers for whom they have ordered the products. *See SOMF ¶¶31 & 36*.

Distributors who personally service their territories distribute products within their territories using trucks with a Gross Vehicle Weight Rating ("GVWR") or Gross Vehicle Weight ("GVW") of at least 10,001 pounds. *See SOMF ¶32*. Some Distributors use smaller personal vehicles for commuting to customer stores to perform merchandising activities at the stores, but not to transport or deliver product. Distributor Noll used his Ford F150 to commute "[o]n the two days that [he] wasn't making deliveries [Wednesday and Sunday] . . . for pull-ups. He had one pull-up each non-delivery day for Hannaford. *See SOMF 33.* He sometimes commuted on these non-delivery days using his wife's 2007 Yukon. When his daughter did pull-ups, she also used the Ford F150 or 2007 Yukon to commute. *Id.* Distributor Noll never used either vehicle other than to commute. *Id.* Distributor Belanger uses his personal vehicle to commute to do merchandising for Wal-Mart; if he has to deliver product, he uses his Isuzu truck. Distributor Curran uses his personal vehicle to commute to do recalls at Hannaford. Distributor Cyr uses his personal car only on non-delivery days (Wednesdays and Sundays) to commute to do recalls. *See SOMF ¶33*.

If Distributors ever use their personal vehicle (other than to commute) as part of their actual work day to transport or deliver product, it is only in exceptional or "emergency" situations.

Distributor Dore used his personal car to deliver product only on occasion: if he had a truck issue, or an account called and said they needed a certain product. Distributor Masse has only used his personal vehicle to make deliveries for "emergencies" like delivering to a customer before a major snowstorm. *See SOMF ¶34*.

F.     **Distributors Pack For Distribution and Distribute Perishable Foods**

When the Distributors arrive at their selected warehouse to accept delivery of the product they ordered, they re-sort and pack the product onto their truck for delivery to the Distributors' customers. This process involves sequencing the products in each Distributor's preferred order based on the stops that the Distributors have for the day, and then packing the products onto the truck. *See SOMF ¶¶35-37*. After packing their trucks, the Distributors then transport and distribute the product to the Distributors' customers. *See SOMF ¶38*.

The bakery products the Distributors' companies purchase for resale to their customers, pack for distribution, and distribute to their customers have a limited shelf life and each product has a designated color code or pick-up date indicating when it must be removed from customer shelves to maintain freshness. Products removed from the market based on the appropriate color code or designated pick-up date are considered "stale" products and products left in the market beyond the appropriate color code or designated pick-up date are considered "out of code." *See SOMF ¶39*. The Distributor Agreements provide that "Maintaining a fresh market is a fundamental tenet of the baking industry. Accordingly, Out of Code Products [ ] left in the market is a material breach of this Agreement." *See SOMF ¶40*. The Distributor Agreements provide that "DISTRIBUTOR may not sell any Out of Code Products or Authorized Products, or those not in saleable condition for distribution to the general public, but may otherwise sell such products to purchasers for non-human consumption." *See SOMF ¶41*. The code or designated pick-up date for the products sold by

Distributors varies by product; some bread products are coded for sale within five days, and others are coded for sale within seven days. *See SOMF ¶42.*

### G.        Plaintiff Stephen Temm's Claims Are Judicially Estopped

Opt-In Plaintiff Stephen Temm ("Temm") is the owner of ZNL Distributors, Inc. *See SOMF ¶43.* On September 24, 2013, Temm, through his company, ZNL Distributors Inc., executed a Distributor Agreement with CK Sales, which became effective on September 30, 2013. Temm Distributor Agreement. *Id.* On October 20, 2015, Temm and his spouse, Chandra Temm, with the assistance of their attorney, filed a Voluntary Petition for Chapter 13 bankruptcy (the "Bankruptcy Petition") in the United States Bankruptcy Court of the District of Maine (the "Bankruptcy Court"). *See SOMF ¶44 & 45.* In his Bankruptcy Petition, Temm did not disclose his instant causes of action against Defendants. *See SOMF ¶46.* The Bankruptcy Petition included a notice pursuant to 11 U.S.C. §342(b), which stated that "[m]aking a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both." *See SOMF ¶47.*

On November 02, 2015, Temm filed his Chapter 13 plan, (*SOMF ¶48*), Schedules A-J, and the Statement of Financial Affairs. *See SOMF ¶49.* Schedule B requires debtors to list all assets in which the debtor owns or has any legal or equitable interest. *See SOMF ¶50.* The Statement of Financial Affairs requires disclosure of all pending or recent lawsuits. *See SOMF ¶51.* Temm's wife disclosed several pending lawsuits involving her. *Id.* Temm did not disclose the instant causes of action. *See SOMF ¶52* (see, in particular, responses to Schedule B, Questions 17, 21, & 35 and Schedule I, Question 1). On December 14, 2015, and again on January 13, 2016, Temm filed amended Schedules, including an amended Schedule B. *See SOMF ¶54.* On January 19, 2016, Temm filed an Amended Chapter 13 Plan with the bankruptcy court (*See SOMF ¶55*) which provided payments over a 55-month period. *Id.*

On February 26, 2016, the Bankruptcy Court entered an order confirming Temm's January 19, 2016 Chapter 13 plan (the "Confirmation Order"). *See SOMF ¶57*. On August 11, 2016, Temm filed a motion to allow and disallow certain claims and to modify his Chapter 13 plan. *See SOMF ¶58*. The Bankruptcy Court granted Temm's motion on September 26, 2016. *Id.* Temm did not disclose the instant causes of action in any amendment of his plan. **Exhibit A**, F. Decl., **Att. A-19, A-20 and A-21** (see, in particular, responses to Schedule B, Questions 14, 17, 21, & 35 and Schedule I, Question 1). *See SOMF ¶56*.

On December 20, 2016, Temm filed his Notice of Consent to join the current lawsuit. *See SOMF ¶59*. Temm claims that he was misclassified as an independent contractor, worked 55-60 hours weekly, and now currently pursues unpaid overtime wages. *See SOMF ¶64*. From (and including) Temm's filing of his motion to allow and disallow certain claims to the most recent Trustee's report filed on September 30, 2017, several documents regarding the administration of Temm's bankruptcy estate have been filed, (*See SOMF ¶61),* while Temm has actively participated in discovery in the instant action. *See SOMF ¶¶62-63.* Temm is in the second year of his approved Chapter 13 plan that is based on his representations made to the Bankruptcy Court. *See SOMF ¶65*. Temm has not been discharged from bankruptcy. *Id.*

**H.**     **Plaintiff Daryle Degen's Claims Have Been Released**

Opt-In Plaintiff Daryle Degen ("Degen") is the owner of Daryle Degen, Inc. and executed a Distributor Agreement with CK Sales, which became effective on February 3, 2014. *See SOMF ¶66*. On October 11, 2014, Daryle Degen, Inc. sold its distribution rights back to CK Sales. *See SOMF ¶67*. As part of the sale, Degen signed a general release of all claims against Defendants. *Id.* Following the sale, Degen sought to pursue certain claims against CK Sales related to his distributorship. The parties mediated their dispute and entered a Settlement Agreement to "settle

fully and finally any and all claims by one against the other." *See SOMF ¶68*.  In the Settlement

Agreement, the parties agreed to a mutual release of all claims against the other. *See SOMF ¶69*.

## II.   <u>LEGAL STANDARD</u>

A motion for summary judgment should be granted when "the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *Celotex v. Catrett*, 477 U.S. 317, 327 (1986). A fact is "material" only if it "has

the potential to alter the outcome of the suit under the governing law." *Smith v. F.W. Morse & Co.,*

*Inc.*, 76 F.3d 413, 428 (1st Cir. 1996). A dispute is "genuine" only if a reasonable jury could resolve

it in favor of either party. *Calero-Cerezo v. U.S. Dept. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).

Thus, if a reasonable jury could not find in favor of the non-movant under applicable law, the moving

party is entitled to summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Summary Judgment is not a disfavored procedural shortcut, but rather is an integral part of the Federal

Rules. *Celotex*, 477 U.S. at 327.

## III.   <u>ARGUMENT</u>

### RULE 23 CLASS STATE LAW CLAIMS

**A.   Defendants Are Entitled to Judgment As A Matter Of Law On Overtime Claims Set out in Count IV, Pursuant To Maine's Perishable Food Exemption; Maine's Outside Sales Exemption; and The Motor Carrier Act Exemption**

Under Maine's wage law, absent an applicable exemption, employers are generally required

to compensate employees at a rate of one and one-half their regular hourly rate of pay for any hours

over forty that the employees work in a week. **26 M.R.S.A. §664.** Assuming only for this Motion that

Plaintiffs are employees, their claims in Count IV for unpaid overtime still fail as a matter law.[2] Even

if employees, the undisputed material facts establish that Plaintiffs are exempt.

---

[2] Defendants maintain that Plaintiffs were properly classified as independent contractors and any reference to Plaintiffs as employees is made solely for the purpose of this Motion for Summary Judgment.

1.    **Maine's Perishable Food Exemption (Count IV- Rule 23 Class)**

Employees involved in either the activity of *packing* perishable foods for shipment or distribution (*e.g.* loading trucks) or the activity of *distributing* perishable foods (*e.g.* delivery truck drivers) are exempt from overtime. **26 M.R.S.A.§664(3)(f) [2017, c. 219, §15(AMD)]("the 2017 Amendment").** The interpretation of this exemption prior to the 2017 Amendment had a well-publicized journey through the courts "for want of a comma." ***O'Connor v. Oakhurst***, 851 F.3d 69, 70 (1st Cir. 2017) (Oakhurst decision). The saga over the missing oxford comma centered on whether the pre-amendment exemption applied solely to the activity of *packing* for shipment/distribution or whether it also exempted the activity of *distribution of* perishable foods. As will be argued below, that distinction, while important to the Oakhurst case, has no bearing on this case.

Prior to the 2017 Amendment, the statutory exemption provided that the overtime wage law did not apply to:

> The canning, processing, preserving, freezing, drying, marketing, storing, packing for shipment or distribution of:
>
> (1)    Agricultural produce;
> (2)    Meat and fish products; and
> (3)    Perishable foods.

26 M.R.S.A. § 664(3)(F).

In ***Oakhurst,*** the First Circuit ruled that because of supposed ambiguity created by the lack of a comma following "shipment," the exemption should be read to cover employees involved in the activity of *packing* perishable foods for either shipment or distribution and not the activity of *distribution of* (the actual delivery of) perishable foods. Distinguishing between those whose functions did not include packing and those that did was important in the ***Oakhurst*** case because, unlike in the case at hand, the milk truck drivers were not, according to the record before the courts, involved in *packing* their trucks.

In response to the Oakhurst decision, the Maine Legislature revised the perishable food overtime exemption to make clear that persons *distributing* perishable foods (in addition to those in the activity of *packing* perishable foods for shipment or distribution) are, and always were intended to be, exempt from overtime. Although the 2017 clarification applies retroactively to 1995, it excludes from its application cases pending on March 12, 2017 (the day prior to the ***Oakhurst*** decision). The legislative history highlights that the focus of this peculiar limitation on retroactivity was an effort to provide relief from the Court of Appeals' decision to all employers except Oakhurst Dairy - the only case then publicized to the legislators. This special legislation extending the retroactive application to all *except* to cases pending on March 12, 2017, if applied to the case at hand, is unconstitutional for the reasons set forth more fully below. However, the Court need not reach the constitutional question because Plaintiffs in the case at hand fall within the coverage of this perishable foods' exemption whether the First Circuit's pre-2017 Amendment interpretation applies to this case or the post-2017 Amendment applies.

### a.     The pre-2017 Amendment Interpretation Entitles Defendants to Summary Judgment

Under the pre-2017 Amendment First Circuit interpretation, the exemption applies to the persons who perform the activity of *packing* perishable foods for shipment as well as to those who perform the activity of *packing* perishable foods for distribution. In the case at hand, the activity of packing for shipment is done at the bakery fulfilling the Distributors' orders for products the Distributors are selling to customers in their respective territories. The activity of *packing* for distribution is done by Distributors at the warehouses at which they pick up the product they purchased from Lepage Bakeries for resale to their customers.

#### i.     Packing for Shipment

Lepage Bakeries and other Flowers Foods' subsidiary bakeries produce product in response to the specific orders placed by Distributors' businesses. ***See SOMF ¶27***. While some products are

produced at bakeries in Maine, many of the products ordered by the Distributors' businesses are produced by bakeries outside of Maine, including but not limited to the products branded Country Kitchen, Barowsky's, Nature's Own, Wonder Bread, and TastyKake. *See SOMF ¶28*. Once these products are ordered by the Distributors' businesses, the orders are transmitted to the applicable in-state or out-of-state bakeries, which in turn bake products in response to these specific orders and then ships them to Lepage Bakeries. *See SOMF ¶29*. Once received by Lepage Bakeries, the bakery immediately trans-ships such products to the warehouses. *See SOMF ¶30*.

### ii.    Packing for Distribution

When the Distributors pick up the product they have ordered from the warehouse, they re-sort and pack (load) the product onto their truck for delivery (the activity of *distributing)* the perishable bakery products to the Distributors' customers. The *packing* activity involves sequencing the products in each Distributor's preferred order based on the stops that the Distributors have for the day, and then packing the products onto their trucks. *See SOMF ¶35*.

Distributor Noll describes the *packing* activity as follows:

> My load would be in stacks of product, roughly 12 feet tall stacking trays. I would separate all of the product, categorize it into whatever. It made it easy for me to actually check the load in. Then I would have my handheld [computer] in hand and it would tell me what I should have in my load. I would go down through it item by item. Make any corrections on that at that point in time and then finalize my load, that way whatever I finalized, that's the inventory that I'm going to be going out with that day. I would then print out a customer list of the customers -- of the accounts that I had for that day, and I would proceed to separate the product that I had just broken down and checked in into those individual accounts and then load them onto my truck.

*See SOMF ¶36*. Distributor Noll further testified that he packed product within his truck based on his "own personal preference"… "[H]e had [his] truck organized in the most productive way [he] thought to best suit [his] needs." *See SOMF ¶37*. Thus, the Rule 23 Class Distributors who personally service their territories perform the *packing* for distribution activity by loading the product into their trucks in whatever order each deems appropriate. *See SOMF ¶35*.

The only other exemption requirement is that the Distributors be packing for distribution "perishable foods." Although Maine's wage and hour laws do not define the term perishable food, the term is defined elsewhere under Maine law as follows: "Perishable food" means any food which may spoil or otherwise become unfit for human consumption because of its nature, type or physical condition. It includes, but is not limited to, fresh and processed meats, poultry, seafood, dairy products, ***bakery products***, eggs in the shells, fresh fruits and vegetables and foods which have been packaged, refrigerated or frozen. 14 MRSA §166 (Immunity For Certain Food Donations). Additionally, under Maine law, "perishable cargo" means cargo of a commercial motor vehicle that is subject to spoilage or decay or is marked with an expiration date. 29-A MRSA §1861 (Abandoned Vehicles).[3]

Regardless of which definition is applied, the bakery products the Distributors' companies purchase for resale to their customers, pack for distribution, and distribute to their customers are perishable foods. The bakery products have a saleable shelf life of 7-days and in some cases only 5-days before becoming stale product that must be removed (a shorter shelf life than either milk or eggs). ***See SOMF ¶42***. Each product has a designated color code or pick-up date indicating when it must be removed from customer shelves. Products removed from the market based on the appropriate color code or designated pick-up date are considered "stale" products and products left in the market beyond the appropriate color code or designated pick-up date are considered "out of code." ***See SOMF ¶39***. The Distributor Agreements provide that "Maintaining a fresh market is a fundamental tenet of the baking industry. Accordingly, Out of Code Products []left in the market is a material breach of this Agreement." ***See SOMF ¶40***. Additionally, the Distributor Agreements provide that

---

[3] Under federal law, the term is defined for purposes of the U.S. Food and Drug Administration ("FDA"), under the Federal Food, Drug and Cosmetic Act, 21 U.S.C. §321, *et seq.*, as: "Perishable food means food that is not heat-treated; not frozen; and not otherwise preserved in a manner so as to prevent the quality of food from being adversely affected if held longer than 7 calendar days under normal shipping and storage conditions." 21 CFR §1.377.

"DISTRIBUTOR may not sell any Out of Code Products or Authorized Products, or those not in saleable condition for distribution to the general public but may otherwise sell such products to purchasers for non-human consumption." *See SOMF ¶41*.

Inclusion of bakery products within the meaning of the §664(3)(F) perishable food exemption is further supported by the purpose of other Maine statutes that use the terms "perishable food" or "perishable goods," which is to ensure that perishable items be sold or dealt with swiftly because its value speedily declines.  See *e.g.* 14 M.R.S.A. § 4352 (Attachments);11 M.R.S.A. § 9-1611 (Uniform Commercial Code); 18-A M.R.S.A. §8-109 (Probate Code-Perishable Goods, effective until 7/1/2019); 18-C M.R.S.A. §8-109 (Probate Code, effective 7/1/2019. Such is the case here. All bread products must be sold within a very short period, 5 to 7 days, before needing to be removed from the shelf and declining in value. Whether by statutory definition or simple common sense, bakery products are perishable food within the meaning of the §664(3)(F) overtime exemption. Because the Rule 23 Class Distributors perform the activity of *packing* for distribution perishable food, they are exempt from overtime and as a matter of law, Defendants are entitled to partial summary judgment on Count IV (overtime claims).

> **b.**      **The 2017 Amendment Also Entitles Defendants to Summary Judgment**

There is also no dispute that the Distributors who personally service their territories perform the activity *of distributing.*  After loading their truck, the Distributors then transport and distribute the product to the Distributors' customers for whom they ordered the product for sale. *See SOMF ¶¶31 &38*. Under the 2017 Amendment, the Maine Legislature clarified the statute's original intent to exempt employees whose function was to distribute perishable food by amending the exemption's punctuation and grammatical structure. Under the 2017 Amendment, Maine law excludes from overtime:

The canning; processing; preserving; freezing; drying; marketing; storing; packing for shipment; or distributing of: Perishable foods. 26 MRSA §664(3)(F).

**26 M.R.S.A.§664(3)(f) [2017, c. 219, §15(AMD)]**

The final provision of the 2017 Amendment reads:

"Sec. 34. Retroactivity. Notwithstanding the Maine Revised Statutes, Title 1, section 302, the provision of this Act that amends Title 26, section 664, subsection 3, paragraph F applies retroactively to September 29, 1995 but does not apply to cases pending on March 12, 2017."

Because the Rule 23 Class Distributors are exempt under the Pre-2017 Amendment interpretation (*packing* for distribution), the Court need not determine whether the pending case exception to retroactivity applies to the case at hand, and if it does, the constitutionality of that application. If, however, the Distributors are not summarily found exempt under the *packing* activity, the Court must determine if the exception applies here and if so, the constitutional question is ripe for determination. As set forth more fully below, the exception does not apply.

> **i.      The Court Is Obliged To Apply The Law As Intended By The Legislature**

A federal court exercising supplemental jurisdiction over a state-law claim "is obliged to apply state substantive law to those claims." ***Nystedt v. Nigro****,* 700 F.3d 25, 30 (1st Cir. 2012). The cardinal rule of statutory construction is to ascertain and effectuate the intent of the Legislature. ***Georgia-Pacific Corp. v. Great Northern Nekoosa Corp.,*** 728 F. Supp. 807,809 (D. Me. 1990). Indeed, it is the court's "duty ... to give effect to the intent of the Legislature." ***Estate of Robbins v. Chebeague & Cumberland Land Trust****,* 2017 ME 17, ¶11 154 A.3d 1185, 1189 (citations omitted). If the statute is ambiguous, the court then will "look to extrinsic indicia of legislative intent such as relevant legislative history." ***Id****.* It makes no difference that the legislative history consists of action taken years after the original enactment of the exemption at issue. Indeed, the Maine Law Court specifically recognizes that "[w]hen

prior legislative terminology is ambiguous, ... , enactments by a later Legislature may be helpful in ascertaining legislative intent and may be taken into consideration in dissipating the uncertainty of a foundational statute." ***Bakala v. Town of Stonington***, 647 A.2d 85, 87 (ME 1994).

### ii.      The 2017 Amendment Clarification Does Not Implicate Retroactivity

The 2017 Amendment simply restructured the "perishable foods" exemption in response to a "perceived ambiguity" and "to clarify current law" "with the intent that work done in the distribution of, or distributing of," perishable foods is exempt. When, as here, a statutory amendment merely clarifies existing law, applying clarified law does not implicate retroactivity. ***Maine School Admin. Dist. No. 27 v. Me. Pub. Emps. Ret. Sys.,*** 2009 ME 108, ¶25, 983 A.2d 391, 399 ("[w]hen a statute does not alter existing rights or obligations, but merely clarifies what those existing rights and obligations have always been, the statute is not retroactive in its operation").

The Maine Law Court's opinion in ***Thompson v. Shaw's Supermarkets, Inc.***, 2002 ME 63, 847 A.2d 406 is particularly applicable. Both the substantive issue and the language of the clarifying amendment in ***Thompson*** are similar to those here. In ***Thompson***, the plaintiff filed a putative class action on February 6, 2002 alleging that drivers were entitled to overtime. ***See*** 2002 WL 34716382 (Me. Super.) (Class Action Complaint). On March 26, 2002, the Legislature enacted a statutory amendment that clarified that the  statute exempted employees engaged in  interstate trucking. ***Thompson***, 2002 ME 63, ¶8, 47 A.2d at 410. As with the 2017 Amendment to the perishable foods exemption, the 2002 Legislature explicitly expressed its intent as to the meaning of the existing statute, stated that the amendment was retroactive to 1995 and as with the 2017 Amendment in the case at hand, the 2002 amendment contained an

exclusion to retroactivity for pending cases. Despite the fact the case was already pending when the 2002 amendment was enacted, the Maine Law Court nonetheless looked to the amendment as evidence of the "Legislature's intent" because the amendment merely clarified and codified the law as it had been applied for years. *Thompson*, 2002 ME 63, ¶847 A.2d at 410. Similarly, the 2017 Amendment clarified and codified Maine law, not only as originally intended, but as it had been applied since at least 2002, when Justice Fritzsche decided that "[t]he statute is clear that an exemption exists for the distribution of the three categories of foods." *Thompson v. Shaw's Supermarkets, Inc.*, 2002 WL 31045303, * 3 (Maine Sup. Ct. 2002).

The Maine Law Court has repeatedly confirmed that when the Legislature clarifies the law, the courts must apply the law as clarified. This is true even when the events in question arose prior to the clarification, including when the litigation was already pending at the time of the clarification. *Bakala,* 647 A.2d at 86. ("The purpose of P.L. 1975, ch. 475 was to clarify the meaning of certain disputed points of municipal law ... In these circumstances, we find it appropriate to apply the clarifications."); In *Maine School Admin. Dist. No. 27 v. Maine Public Employees Retirement Sys.*, 983 A.2d 391 (ME 2009)( issues related to retroactivity are irrelevant "[w]hen a statute does not alter existing rights or obligations, but merely clarifies what those existing rights and obligations have always been"). *Id.* at 399 (internal punctuation and citation omitted).

### iii.    If The Pending Case Exception To Retroactivity Is Applied To This Case, Such Application is Unconstitutional

Maine has adopted a general rule of construction that amendments enacted while a case is pending are not affected by the enactment. 1 M.R.S.A. § 302 (2011); *MacImage of Maine, LLC v. Androscoggin Cnty.*, 2012 ME 44, ¶22, 40 A.3d 975, 985. However, that rule is

overcome "by legislation expressly citing § 302, or explicitly stating an intent to apply a provision to pending proceedings." *Id.¶¶22-23, 40 A.3d 975* at 985-86. The 2017 Amendment meets both of those alternative tests. And indeed the 2017 Amendment fits precisely one of the reasons the Legislature may make an amendment retroactive - i.e. to "thereby undo what it perceives to be the undesirable  past consequences of a misinterpretation of its work product." *Id.* at 986.

Additionally, it is notable that the 2017 Amendment as originally drafted was retroactive to 1995 and expressly applied to pending cases. While the Maine Legislature clearly intended to correct the misinterpretation by the First Circuit and to overrule the *Oakhurst* decision, the Maine Equal Justice Partners raised a concern that it would be an impermissible infringement upon the authority granted the judicial branch of government to have the 2017 Amendment apply to overturn the *Oakhurst* decision. *See,* **Exhibit A**, F. Decl., **Att. A-36** (May 15, 2017 Written Testimony in Opposition to Proposed Retroactivity Provision in Section 27 of LD 1575). Rather than distinguish the *Oakhurst* decision, the Maine Legislature enacted the "no pending case" carve out to retroactivity. The date for the no pending case carve out was enacted as March 12, 2017, the day before the *Oakhurst* decision.[4]

Application of the retroactivity exclusion to the case at hand is unenforceable because it would be unconstitutional. The Maine Constitution's "Special Legislation Clause, CONST. art. IV, pt. 3, § 13, is violated when special legislation is enacted when a general law could have been made applicable." *Fitanides v. City of Saco*, 2004 ME 32,¶11, 843 A.2d 8, at 12. Maine

---

[4] The question of constitutionality was not reached by the Court in the *Oakhurst* case because that case was settled among the parties. If the 2017 Amendment is applied to the case at hand, the constitutional question is ripe for determination.

cases "reveal a judicial vigilance, dating back to the first days of statehood and continuing to the present, against *ad hoc* legislative attempts to single out certain named individuals for benefits not available to the general citizenry." ***Nadeau v. State***, 395 A.2d 107, 112 (Me1978). If applied to the case at hand, the 2017 retroactivity exclusion is clearly and exclusively aimed at benefitting the Plaintiffs in this case and only them. The case at hand is the only other known case pending on March 12, 2017 involving the legal question of whether employees who distribute perishable foods are thereby exempt from overtime. The Legislature can make laws based on "a reasonable classification of the objects of the law," but in the absence of reasonable and objective grounds for treating certain individuals better than others, the Legislature is prohibited from doing so. ***Id.*** at 113. There is no reason the Plaintiffs in the case at hand (or Oakhurst for that matter) should be entitled to overtime when no other Maine citizens who have distributed perishable foods since 1995 are entitled to overtime.

As a matter of law, the Rule 23 Class Distributors are exempt from Maine's overtime provision both under the pre-2017 Amendment exempting the activity of *packing* perishable foods for distribution, as well as the 2017 Amendment clarification exempting the activity of *distribution of* perishable foods.

## 2. The Motor Carrier Act Exemption (Count IV- Rule 23 Class)

Maine law also exempts from overtime, "[a] driver or driver's helper who is not paid hourly and is subject to the provisions of 49 United States Code, Section 31502 as amended or to regulations adopted pursuant to that section, who is governed by the applicable provisions of federal law with respect to payment of overtime." 26 MRSA §664(3)(K). There is no dispute that Distributors' companies, whether or not the Distributors personally service their territories, are not paid by the hour. ***See SOMF ¶¶8-12***. Otherwise, Maine's exemption is co-extensive with the FLSA Motor Carrier Act exemption and analyzed under federal law. ***See, Smith v. Schwann's Home Service, Inc.***,

No. 2:13-cv-231, 2014 WL 6679129, *27-30 (D. Me. Nov. 25, 2014) (analyzing federal and state MCA exemptions under federal law). Therefore, any Rule 23 claims for unpaid overtime fail as a matter law as the Motor Carrier Act ("MCA") overtime exemption (29 U.S.C. §213(b)(1)) precludes them from recovering overtime if deemed employees.

The overtime exemption applies to employees who affect the safe operation of a commercial motor vehicle with a GVWR or a GVW of at least 10,001 pounds that is used to transport property in interstate commerce. Drivers who transport property entirely within the borders of one state are still subject to this Motor Carrier Act overtime exemption when their delivery of property is part of a continuum of transportation of property commenced by others outside of the state.

### a.     **Interstate Commerce**

Section 13(b)(1) of the FLSA provides an exemption from the overtime requirements of the FLSA to "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service." ***29 U.S.C. § 213(b)***. The Motor Carrier Act ("MCA"), 49 U.S.C. §§ 31502-31504 provides authority to the Secretary of Transportation and identifies those types of employees over whom the Secretary has jurisdiction, including those employed in transportation as defined in 49 U.S.C. § 13501.

Included within the group of employees over whom the Secretary of Transportation has jurisdiction are employees of a motor private carrier who "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways." ***29 C.F.R. § 782.2***; ***see also, 49 U.S.C. § 31502(b)(2)***. A "motor private carrier" is defined as a person transporting property by motor vehicle when:

> (A)   the transportation is as provided in section 13501 of this Title;
>
> (B)   the person is the owner, lessee or bailee of the property being transported; and
>
> (C)   the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

*49 U.S.C. § 13102(13)*. There is no question that, if Plaintiffs are/were employees, then the Defendants clearly satisfy the definition of a motor private carrier. *Bilyou v. Dutchess Beer Distributors, Inc.,* 300 F.3d 217, 224 (2d Cir. 2002)(wholesale beverage distributor and its employees are a "person…transporting property by private motor carrier."). Moreover, Lepage Bakeries is registered with the U.S. Department of Transportation ("DOT") as a Motor Private Carrier, with DOT Number 94424. *See SOMF ¶26*.

For the MCA overtime exemption to apply, the driver must be involved in the transport of property between a place in a State and a place in another State. *49 U.S.C. § 13501*. "Even if a carrier's transportation does not cross state lines, the interstate commerce requirement is satisfied if the goods being transported within the borders of one State are involved in a 'practical continuity of movement' in the flow of interstate commerce. *Bilyou,* 300 F.3d at 223, *quoting, Walling v. Jacksonville Paper Co.,* 317 U.S. 564, 568, 63 S.Ct. 332, 87 L.Ed. 460 (1943); *see also, Atlantic Coast Line R. Co., v. Standard Oil Co., of Kentucky,* 275 U.S. 257, 267-69, 48 S.Ct. 107, 72 L.Ed. 270 (1927); *Project Hope v. M/V Ibn Sina,* 250 F.3d 67, 74 (2d Cir. 2001). Whether the subject transportation is of an interstate nature can be "'determined by reference to the intended final destination' of the transportation when the ultimate destination was envisaged at the time the transportation commenced." *Project Hope,* 250 F.3d at 74; *see also, Atlantic Coast Line,* 275 U.S. at 269, 48 S.Ct. 107 (determining continuity of transportation by examining whether the destination of the goods is "arranged for or fixed in the minds of the sellers"); *Klitzke v. Steiner Corp.,* 110 F.3d 1465, 1469 (9th Cir. 1997)("Whether transportation  is interstate or intrastate is determined by the essential character of the commerce, *manifested by shipper's fixed and persisting transportation intent at the time of the shipment…"); See also 29 C.F.R. § 782.7(b)(2)*(intrastate transportation can satisfy the interstate commerce requirement of the MCA if the shipper has a "fixed and persisting transportation intent beyond the terminal storage point at the time of shipment.")

Analogous cases are illustrative of what constitutes "fixed and persisting transportation.". In ***Shew v Southland Corp.,*** 370 F.2d 376-380 (5th Cir. 1996), the Fifth Circuit Court of Appeals found that a delivery driver of Southland Corporation was exempt from overtime under the MCA exemption, even though he (like the Plaintiffs in the case at hand) drove a wholly intrastate route. Specifically, Southland received various products at its Dallas plant which it purchased from producers outside Texas and which were distributed to branch locations in Texas by transport truck drivers. The driver at issue delivered milk, butter, and other products, which were manufactured by the out-of-state producers, from the Dallas plant to intrastate locations. The products the driver delivered were ordered by the branches every other day based on anticipated needs of the customers. These orders were consolidated by the Dallas office and an order was then placed with out-of-state producers. No processing or alteration of the out-of-state products was done at the Dallas plant. The Court reasoned that notwithstanding the driver's wholly intrastate route, there was a substantial movement of commodities in interstate commerce through the distribution of out-of-state products. Further, the driver distributed those out-of-state products within a short time frame of their arrival at the Dallas plant (within the same or next day) pursuant to pre-existing orders from the Southland branch. Thus, the court reasoned that because the driver delivered shipments that "originate[d] out of state and [were] part of a continuous movement in interstate commerce," he was exempt from overtime under the MCA exemption. ***Id.***

***McGuigan v. CPC Int'l, Inc.,*** 84 F.Supp. 2d 470 (S.D.N.Y. 2000), which also involved bakery distributors, is likewise illustrative. Therein, the plaintiffs distributed and sold bakery products to retail accounts, which were all in New York. However, the products plaintiffs ordered for their accounts were produced at a baking plant in New Jersey. These products were subsequently shipped to distribution depots in New York, where plaintiffs picked them up for delivery to their retail accounts. ***See id***. at 472. Finding the plaintiffs' overtime claims to be barred by the MCA exemption,

the court reasoned (in pertinent part) that plaintiffs were engaged in interstate commerce because the goods they distributed were (1) ordered for specific customers, (2) produced by the out-of-state baking facility in response to those specific orders, and (3) delivered across state lines for subsequent delivery by the distributors within New York. The court found that the out-of-state shipper, had the requisite "fixed and persisting intent" when it took orders in New Jersey for products that would be delivered in New York. The temporary placement of goods at the warehouse was simply not relevant. *See id.* at 483.[5]

Other Courts of Appeals have consistently reached the same conclusion. *See, Mena v. McArthur Dairy LLC,* 352 Fed.Appx. 303, 307 (11th Cir. 2009)(plaintiff's transportation of dairy products within the state was part of the "practical continuity of movement" across state lines as the distribution center was nothing more than a temporary storage hub used to facilitate the orderly distribution  of out of state products); *Talton v. I.H. Caffey Distributing Co., Inc.,* 124 Fed. Appx. 760 (4th Cir. 2005)(alcohol beverages that were carried and delivered solely in-state by route driver for wholesaler-distributor were products in interstate commerce such that driver was exempt from overtime under the Motor Carrier Act overtime exemption). *See also, Barefoot v. Mid-America Dairymen, Inc.,* 826 F.Supp. 1046, 1049 (N.D. Tex1993), *citing, Shew v. Southland Corp.,* 370 F.2d 376, 380 (5th Cir. 1966); *Middlewest Motor Freight Bureau v. Interstate Commerce Comm'n,* 867 F.2d 458, 460-61 (8th Cir. 1989); *Texas v. United States,* 866 F.2d 1546, 1556-57 (5th Cir. 1989); *Baird v. Wagoner Transp. Co.,* 425 F.2d 407, 412 (6th Cir. 1970); *Galbreath v. Gulf Oil Corp.,* 413 F.2d 941, 947 (5th Cir. 1969).

---

[5] It is not necessary that the shipper know specifically which goods are earmarked for a particular customer, only that the goods will ultimately continue from the warehouse to a customer in a state different from that of the shipper. *See Shew, supra* (shipper had fixed and persisting intent beyond terminal storage point at time of shipment even though orders consolidated); Dep't of Labor Opinion Letter FLSA 2005-2NA, 2005 WL 5419038 (Apr. 27, 2005) (shipper had fixed and persisting intent even though goods not earmarked for a particular store where understood at the time of shipment that goods will ultimately continue from warehouse to retail customer); Dep't of Labor Opinion Letter, 1999 WL 1002364 (Feb. 10, 1999). **See, Exhibit A,** F. Decl., **Att. A-37 and A-38.**

In ***Collins v. Heritage Wine Cellars, Ltd,*** 589 F.3d 895 (7th Cir. 2009), the court found that employees who delivered wine to customers for a wholesaler were exempt from overtime pursuant to the Motor Carrier Act exemption. The court held:

> It seems to us that when a shipper transports his product across state lines for sale by him to customers in the destination state, and the product undergoes no alteration during its journey to the shipper's customer, and interruptions in the journey that occur in the destination state are no more than the normal stops or stages that are common in interstate sales, such as temporary warehousing, the entire journey should be regarded as having taken place in interstate commerce within the meaning of the Motor Carrier Act's exemption from the Fair Labor Standards Act.

***Id.,*** at 898.

Finally, to qualify for the Motor Carrier Act overtime exemption, the duties of the employee in question must affect the "safety of operation." Federal regulations specifically state that driving a covered vehicle in interstate commerce is a safety affecting activity. ***29 C.F.R. §782.3***. ***See also, Cerutti v. Frito Lay, Inc.,*** 777 F.Supp.2d 920, 927 (W.D. PA. 2011). "Generally, the duties of drivers affect safety of operation, so drivers employed by motor carriers covered by the Motor Carrier Act are subject exclusively to the authority of the Secretary of Transportation." ***Cerutti, supra, quoting, Dalton v. Sabo, Inc.,*** 2010 WL 1325613, at *2 (D.Or. 2010).

In light of the overwhelming case law cited above as well as the lack of any contrary authority, if the Plaintiffs are deemed employees, they also then are exempt from overtime pay under either state or federal law. (1) There is no dispute that they operated commercial motor vehicles having a GVWR or a GVW of greater than 10,001 pounds. (2) As the drivers of these trucks, each clearly affected the safe operation of the truck. ***See 29 C.F.R. § 782.3.*** And finally, (3) there is no dispute that they transported freshly baked products in interstate commerce. The products are baked according to the Distributors' sales orders. ***See SOMF ¶27***. At the time of shipment from the out of state bakeries, the products have a fixed and persisting final destination. ***See SOMF ¶¶22, 23, 28-30***. The products that the Plaintiffs delivered paused at the warehouse only for the brief period of time the Distributors

process their loads and pack their trucks before continuing their movement in interstate commerce. *See SOMF ¶36.* The transportation of the freshly baked products from the distribution center to customers qualify the Distributors for the Motor Carrier Act overtime exemption under both state and federal law. *Collins v. Heritage Wine Cellars, Ltd,* 589 F.3d 895 (7th Cir. 2009); *Thomas v. Wichita Coca-Cola Bottling Co.,* 968 F.2d 1022, 1025 (10th Cir.), *cert. denied,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992); *see also, Opelika Royal Crown Bottling Co. v. Goldberg,* 299 F.2d 37, 41-42 (5th Cir. 1962).

### b. Vehicles Weighing At Least 10,001 Pounds

Plaintiff has stipulated that all class member Distributors who personally service their territories distribute products within their territories using trucks with a GVWR or the GVW of 10,001 pounds or more. *See SOMF ¶32.* The only remaining question is whether the use of a vehicle with a GVWR or a GVW less than 10,001 pounds ("small vehicle") by Distributors to commute on non-delivery days or on rare occasions to deliver to a stop or two in an emergency removes them for the week in question from the MCA exemption. As set forth more fully below, based on the undisputed facts of the case at hand, it does not.

In 2008, Congress enacted the SAFETEA-LU Technical Corrections Act of 2008, Pub. L. No. 110-244 H.R. 1195, 110th Cong. ("TCA"). The TCA amended the FLSA and the applicability of the Motor Carrier Act overtime exemption to those drivers who affect the safety of operation of motor vehicles weighing at least 10,001 pounds in interstate commerce. As noted by Chief Judge Woodcock, federal courts have taken an inconsistent approach in answering the question of whether the MCA Exemption applies to an employee who drives both exempt and non-exempt vehicles - referred to by some courts as "mixed activities." Some have held that employees who participate in mixed activities are subject to the MCA Exemption. *Smith v. Schwan's Home Service, Inc.,* 2104 WL 6679129 *27 (indicating *de minimis* use of smaller vehicles does not defeat the exemption) , *citing e.g., Hernandez*

*v. Brink's, Inc.,* No. 08–20717–CIV, 2009 U.S. Dist. LEXIS 2726, at *15–16, 2009 WL 113406, at *6 (S.D.Fla. Jan.15, 2009) ("Reverting to the principle derived from regulations governing mixed duties, when mixed activities occur, the Motor Carrier Act favors coverage of the employee during the course of employment"). We encourage this Court to hold that "when mixed activities occur, the Motor Carrier Act favors coverage of the employee during the course of employment." *Dalton v. Sabo, Inc.,* 2010 WL 1325613, at *4 (D.Or. Apr.1, 2010) quoting *Hernandez v. Brink's Inc.,* 2009 WL 113406, at *6. However, particularly when such use is *de minimis*, as here, the Court need not reach that issue to hold that Distributors are covered by the MCA overtime exemption for the vast majority of weeks in which they did not use personal vehicles to deliver product.

For the TCA to apply and thereby preclude use of the Motor Carrier Act overtime exemption, the Distributor must actually be transporting goods in interstate commerce in the smaller vehicle. The *de minimis* standard does not even apply if the smaller vehicles are not used to transport goods in interstate commerce. *See* SAFETEA-LU, Pub. L. No. 110-244 Title III, §305 (2008)(2)(B)(work must "affect[] the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce") (emphasis added). *See also, e.g., Garcia v. W. Waste Svcs, Inc.*, 969 F. Supp. 2d 1252 (D. Id. 2013) (because plaintiff did not transport property across state lines when using the personal vehicle, he was not a "covered employee.").[6]

Wednesdays and Sundays are non-delivery days. Consequently, on those two days, Distributors drive directly to the customer account whose service requires the merchandising activities. Distributor Noll used his Ford F150 "[o]n the two days that [he] wasn't making deliveries [Wednesday and Sunday]. . .  for pull-ups. He had one pull-up each non-delivery day for Hannaford. *See SOMF 33.* He sometimes used his wife's 2007 Yukon. When his daughter did pull-ups, she also

---

[6] In addition, Distributors use of a small vehicle to travel to the customer's store on non-delivery days is also not relevant to the inquiry because commuting is an exempt activity under the Portal to Portal Act, 29 U.S.C. § 254(a)(1); 29 CFR §§785.34, 785.35.

used the Ford F150 or 2007 Yukon[7]. *Id.* Distributor Noll never used either vehicle for deliveries. *Id.* Distributor Belanger uses his personal vehicle to commute to Wal-Mart to merchandise. If he has to deliver product, he uses his Isuzu truck. Distributor Curran uses his personal vehicle to commute to Hannaford to do recalls. Distributor Cyr uses his personal car only on non-delivery days Wednesday and Sunday to commute to do recalls. *See SOMF ¶33*.

If Distributors ever use their personal vehicle to transport or deliver product, it is only in exceptional or "emergency" situations. Distributor Dore used his personal car to deliver product only on occasion: if he had a truck issue, or an account called and said they needed a certain product. Distributor Masse has only used his personal vehicle to make deliveries for "emergencies" like delivering to a customer before a major snowstorm. *See SOMF ¶34*. Emergencies are few and far between and constitute *de minimis* use of a small vehicle, requiring application of the MCA exemption as a matter of law.[8]

### 3. Maine's Outside Sales Exemption (Count IV- Rule 23 Class)

In addition to the perishable foods and motor carrier overtime exemptions, the Rule 23 Class Members would be exempt from overtime under Maine's outside sales exemption. Employers are granted an exemption to pay overtime to "[e]mployees whose earnings are derived in whole or part from sales commissions and whose hours and places of employment are not substantially controlled by the employer." 26 MRSA §663(3)(C). The Maine statute differs from the FLSA in that it considers whether the employer "substantially" controls the employees "hours and places of employment" as a factor in determining exempt status. With respect to the first element, the Distributors earnings are derived in whole from sales and if deemed employees such earnings would be commissions

---

[7] Of course, in those weeks in which Noll's daughter performed the merchandising activity on non-delivery days rather than Noll, this issue of small vehicle use is immaterial.  Her use of a small vehicle cannot impact Noll's exempt status.
[8] The record is devoid of any evidence that small vehicle use to deliver product is more than sporadic and *de minimis*. Nonetheless, even if use of a small vehicle defeats the exemption, the exemption can only be defeated for the specific weeks in question.  "An employee may thus be exempt in 1 workweek and not in the next." 29 C.F.R. § 780.10.

(compensation directly tied to sales transactions)[9]. ***See SOMF ¶¶8-12.*** With respect to the second element, the undisputed facts establish that Distributor hours and places of work are not controlled at all by Defendants, let alone substantially.

Each Distributors' business is affiliated with a warehouse. ***See SOMF*** ¶23. Distributors' sales and sales efforts are pursued in their respective defined territories away from Defendants' warehouses. ***SOMF ¶¶13-22.*** Distributors are not required to personally service their territories, and their companies are free to hire or engage any individuals of their choosing to perform the obligations under the Distributor Agreement. ***See SOMF*** ¶7.

While there is no definition of "substantial" in Maine's exemption statute and there is no Maine case that defines what "substantial" means, the First Circuit faced this question in ***Palmieri v. Nynex Long Distance Co.,*** 437 F. 3d 111 (1st Cir. 2006). The issue in ***Palmieri*** focused on whether the employer substantially controlled the hours and places of Palmieri's employment, such that he fell outside the Maine exemption from overtime. Palmieri was a sales representative responsible for selling new products and services to potential clients. Palmieri asserted that the company exerted substantial control over his hours and places of employment by assigning him additional service matters that required him to stay in the office. ***Palmieri,*** 437 F. 3d at 114.

Both the District Court and the Court of Appeals disagreed with Palmieri, noting that the Maine statute only raises the question of whether the employer substantially controlled the employee's hours and places of work. The Maine statute does not raise the question of whether the employer adopted policies or made assignments that substantially influenced the manner in which the employee could conduct business (including hours and work locations). ***Id.***

---

[9] The Maine wage and hour laws do not define the term "sales commissions." Maine's basic rules of statutory interpretation require that words in a statute be given "their plain, common, and ordinary meaning." ***Palmieri,*** 437 F.3d at 114. "Commission," the noun in the statute, means "A fee paid to an agent or employee for a particular transaction, usu. as a percentage of the money received from the transaction." **Black's Law Dictionary, Eighth Edition,** at p. 286.

On appeal, finding nothing helpful in the legislative history, the Court relied upon the plain meaning of the statutory language.   Maine's basic rules of statutory interpretation require that words in a statute be given "their plain, common, and ordinary meaning." ***Id., citing Butterfield v. Norfolk & Dedham Mut. Fire Ins. Co**.,* 2004 ME 124, ¶4 860 A.2d 861, 862.[10] "Control," the verb in the statute, means "to exercise restraining or directing influence over" or "to have power over." Merriam–Webster Online Dictionary, *http://www.m-w.com.* "Substantially," the adverb modifying "control," means "considerable in quantity" or "significantly great." ***Id.*** at 116.

Using these definitions as a guide, the Court determined that Verizon's oversight of Palmieri could not be deemed "substantial control," stating "[t]his was not a case where Verizon told Palmieri that he had to be at his desk every day for a set number of hours in order to answer service-related calls from customers. Rather than being "substantially controlled," he was given substantial latitude to work as he saw fit." ***Id.***

In the case at hand, with respect to the places of employment, each Distributors' business is affiliated with a warehouse and Lepage Bakeries ships the products ordered by the Distributors' business to whichever warehouse the Distributors select to receive that product. ***SOMF ¶¶23 &30***. Distributors' sales and sales efforts are pursued in their respective territories away from Defendants' warehouses. ***SOMF ¶¶13-22.*** Distributors are not required to personally service their territories, and their companies, not Defendants, choose who services their territories. ***See SOMF ¶7***. Some distributorships own multiple territories and engage full-time individuals to operate the territories. ***Id.*** Some are operated by the majority owner *(Id.)* and some of the owner-operated distributorships engage individuals on a part-time basis to assist with various aspects of the business. ***Id.*** Regardless of the business approach, each Distributor, not the Defendants, determines the hours they work, including start times, and total hours worked. ***Id.*** The Distributors set their own schedules to meet

---

[10] *superseded by statute,* P.L. 2005, ch. 591, § 1 (effective Aug. 23, 2006) on a different point of law.

their customer's needs. *Id.* Distributor Landry starts his day at about 4:00 AM, based on his customers' service needs. *See SOMF* ¶25. Distributor Dore makes his own distribution schedule during the day, he just needs to deliver to certain accounts by a certain time. *Id*.

Based on the undisputed facts, Defendants do not control at all, let alone substantially the hours and places of employment. The Rule 23 class members are exempt from overtime as a matter of law**.**

**B.      Plaintiffs have no private right of action to pursue Count III (Misclassification under 26 M.R.S.A.§ 591-A and § 1043(11)) or that Portion of Count IV asserting a claimed failure to maintain accurate records under 26 M.R.S. § 622**

In Count III ("Maine's Independent Contractor Law"), Plaintiff alleges that "[u]nder 26 Me. Rev. Stat. § 1043(11)(E) Defendants have intentionally or knowingly misclassified" plaintiff[s][] as independent contractors" and that "[u]nder 26 Me. Rev. Stat. §591-A, an employer who intentionally or knowingly misclassifies an employee as an independent contractor commits a civil violation for which a fine of not less than $2,000 and not more than $10,000 per violation may be adjudged." (Compl. ¶¶ 70–71). Plaintiff and the Rule 23 class seek "all statutory and equitable remedies to which they are entitled." Compl. ¶72. For the reasons set forth below, § 1043(11)(E) is not the applicable test for wage and hour claims and even if it were, §591-A does not include a private right of action. Additionally, there is no private right of action under 26 M.R.S. § 622.

Section §591-A states an employer which intentionally or knowingly misclassifies an employee as an independent contractor commits a civil violation for which a fine of not less than $2,000 and not more than $10,000 per violation may be adjudged. 26 M.R.S.A. § 591-A. An independent contractor for the purpose of Section 591-A is defined as an individual who qualifies as an independent contractor under section 26 M.R.S.A §1043(11)(E).

§ 1043(11)(E) became law on Jan. 1, 2013, to help establish a consistent standard for determining independent contractor status under Maine's workers' compensation and unemployment

compensation laws. The Legislature did not incorporate this statutory test into Maine's wage and hour laws and Plaintiffs do not dispute that the new statutory test did not replace the ***Murray case*** common law test regarding independent contractor status under Maine's wage and hour laws. Because the statutory test set forth under § 1043(11)(E) does not apply to Plaintiffs' overtime claims, Count III must be dismissed because it fails, as a matter of law, to state a claim upon which relief can be granted. Even if § 1043(11)(E) were the applicable test, §591-A does not provide a private right of action.

Maine law presumes that - absent express legislative intent to the contrary - statutes imposing monetary penalties do not simultaneously convey a private right of action. ***See In re Wage Payment Litig.***, 2000 ME 162, ¶ 7, 759 A.2d 217, 222 (Me. 2000) (stating when the Legislature deems it "essential that a private party have a right of action, it has expressly created one" by "express[ing] its intent in the statutory language or in the legislative history"); ***Boylan v. Foster Carpenter Black & Co., LLP***, No. CIV.A. CV-01-154, 2002 WL 1023514, at *1 (Me. Super. Apr. 16, 2002) ("An express enactment of a private right of action is the 'more likely' expression of the Legislature's intent. The other manner the Legislature might express its intention to create a private right of action is through the legislative history underlying such a penalty.").

This presumption certainly applies to employment statutes, such as this, which allow for monetary penalties. ***See, e.g. Larrabee v. Penobscot Frozen Foods, Inc.***, 486 A.2d 97, 101 (Me. 1984) (no private right of action under section 1051, the unemployment fraud statute, or section 630, which requires employer to provide written statement for reason of termination, despite both statutes imposing monetary penalties for a violation); ***Gibson v. Nat'l Ben Franklin Ins. Co.***, 387 A.2d 220, 223 (Me. 1978) (permitting the imposition of statutory penalties fines, but not implying a private right of action, when employer fails to properly or timely pay workers' compensation benefits); ***Boylan***, 2002 WL 1023514, at *1 (no private right of action under section 631, which grants employees the right to view their personnel file and imposes a fine for a violation).

Plaintiffs also assert within Count IV, a claim under 26 M.R.S. § 622 for failure to keep and preserve accurate time records. This statute, which provides for a forfeiture of $100 to $500 for each violation, also does not convey a private right of action. It "is the type of civil violation that is solely enforceable by the Attorney General unless otherwise specified." *In re Wage Payment Litig.*, 759 A.2d 217, 222 (Me. 2000); *see also In re Wal-Mart Wage & Hour Employment Practices Litig.*, 490 F. Supp. 2d 1091, 1131 (D. Nev. 2007) ("Pursuant to § 626–A, only the Maine Department of Labor may pursue civil forfeiture penalties against an employer for violating § 622.").

Because there is no private right of action, Count III of Plaintiff's Complaint asserting a claim under 26 M.R.S.A.§591-A and that portion of Count IV asserting a claim under 26 M.R.S.A §622 must be dismissed for a failure to state a claim upon which relief can be granted or, in the alternative, for entry of summary judgment in Defendants' favor.

## C.    The FAAAA Preempts Factor Eight Of Maine's Common Law Test

Under the Maine common law multi-factor test of independent contractor status, set out in *Murray's Case*, 154 A. 352 (Me. 1931), the factor of whether the work performed is part of the regular business of the employer has been held out as "particularly important" and deserving of greater weight in the analysis. *See Venegas v. Global Aircraft Serv., Inc.*, 159 F. Supp. 3d 93, 104 (D. Me. 2016) (citing *Legassie v. Bangor Publ'g Co.*, 741 A.2d 442, 445 n.4 (Me. 1999)). The Federal Aviation Administration Authorization Act of 1994 ("FAAAA") expressly preempts any state law "related to a price, route, or service of any . . . motor private carrier." 49 U.S.C. § 14501(c)(1). Applying the broad FAAAA preemption standard in a misclassification case brought by FedEx delivery drivers, the First Circuit has expressly held Prong B of the Massachusetts "ABC" test of independent contractor status (requiring that the service performed by an independent contractor be "outside the usual course of the business of the employer," M.G.L. c. 149, § 148B(2)) to be preempted as applied to a motor private carrier. *Schwann v. FedEx Ground Package Sys., Inc.*, 813 F.3d 429,

435-440 (1st Cir. 2016). Lepage Bakeries is a motor private carrier under the FAAAA that bakes and transports product in interstate commerce. The factor relating to whether the work in question is a part of Defendants' regular business must be preempted by the FAAAA under the reasoning in **Schwann** and thus Plaintiff must be precluded from relying on this factor as grounds for a finding of misclassification related to any of his state law claims.

**D.    Class Member Degen's Claims Must Be Dismissed Pursuant To A Valid And Enforceable Release**

On October 11, 2014, Opt-In Plaintiff Daryle Degen through Daryle Degen, Inc. sold its distribution rights back to CK Sales. ***See SOMF ¶67***. As part of the sale, Degen signed a general release of all claims against Defendants. ***See SOMF ¶68***. In particular Degen provided a comprehensive release of all claims. ***Id.*** Following the sale, Degen sought to pursue certain claims against CK Sales related to his distributorship. The parties mediated their dispute and entered a Settlement Agreement to "settle fully and finally any and all claims by one against the other." ***See SOMF ¶68***. Accordingly, Degen is precluded from pursuing any claims under state law.

## FLSA COLLECTIVE CLAIM

**E.    Defendants Are Entitled to Judgment As A Matter Of Law On Count I (FLSA Overtime Claim) As Plaintiffs Are Exempt from Overtime, Pursuant To the Motor Carrier Act and Outside Sales Exemptions**

In **Encino Motorcars, LLC v. Navarro**, 138 S.Ct. 1134, 200 L.Ed.2d 433 (2018), the United States Supreme Court rejected the principle that exemptions to the FLSA should be construed narrowly. ***Id.***, at 1142. "The narrow-construction principle relies on the flawed premise that the FLSA "'pursues' its remedial purpose" 'at all costs.'" ***Id.*** (citations omitted). "But the FLSA has over two dozen exemptions in § 213(b) alone, including the one at issue here. Those exemptions are as much a part of the FLSA's purpose as the overtime-pay requirement…We thus have no license to give the exemption anything but a fair reading." ***Id.***

1.      **MCA Exemption (Count I Opt-In Plaintiffs)**

Defendants incorporate by reference Argument A(2), *supra,* which equally applies to the Opt-In Plaintiffs' overtime claims. For the same reasons the Rule 23 class members are covered by the Motor Carrier Act overtime exemption, so too are the FLSA Opt-In Plaintiffs' claims exempt from overtime under the Motor Carrier Act overtime exemption.

2.      **The FLSA Outside Sales Exemption (Count I-Opt-In Plaintiffs)**

Even if the FLSA Opt-In Plaintiffs are found not to be independent contractors, they would still be exempt from overtime under the FLSA's outside sales exemption (which differs from Maine's Outside Sales exemption and therefore is fully briefed here). 29 U.S.C. § 213(a)(1). The outside sales exemption applies to: any employee: (1) whose primary duty is: (i) making sales within the meaning of section [203(k) ], *or* (ii) obtaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; *and* (2) who is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty. 29 C.F.R. § 541.500(a) (paragraph breaks omitted).The FLSA defines the words "sale" or "sell" to "include[ ] any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition," § 203(k), and regulations promulgated by the Department of Labor ("DOL") specify that this includes "the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property," 29 C.F.R. § 541.501(b).[11]

The regulations specifically recognize that driver salesmen, like Plaintiffs, are exempt. 29 C.F.R. § 541.504. For driver salesmen, any work performed "incidental to and in conjunction with the employee's own outside sales or solicitations," including "loading, driving, or delivering products" is also considered exempt outside work. 29 C.F.R. § 541.504(a). Promotional activities

---

[11] The Department of Labor's regulations "have the force of law," and "are to be given controlling weight unless they are found to be arbitrary, capricious, or manifestly contrary" to the FLSA. ***Freeman v. Nat'l Broad. Co., Inc.,*** 80 F.3d 78, 82 (2d Cir.1996).

directed towards the consummation of the sale, such as placing point-of-sale materials, merchandising and rotating products, is also considered exempt outside sales work. *See* 29 C.F.R. § 541.503(c). The regulations provide several, alternative examples of driver salesmen who are exempt including: (1) drivers who are the only sales contact with the customers, take orders for products and deliver the products to the customer, and are compensated based on the volume of products sold; (2) drivers who obtain or solicit orders for products from persons who have authority to commit the customer for purchases; (3) drivers who call on new customers along their route, while attempting to "convince them" to accept the "regular delivery of goods: or (4) drivers who sell to "established customers" and persuade "regular customers" to accept the delivery of new or additional products, "even though the initial sale or agreement for delivery was made by someone else." 29 C.F.R. § 541.503(c)(1)-(4). ***See also Ackerman v. Coca-Cola Enterprises, Inc.,*** 179 F.3d 1260 (10th Cir. 1999)(sales representatives and account managers covered by the outside sales exemption notwithstanding that in addition to selling, they also delivered and merchandised the product they sold); ***Reyes v. Goya Foods, Inc.,*** 549 F.App'x. 876, 877 (11th Cir. 2013)("although plaintiff may have spent little time promoting Goya's products – his position as a sales broker…qualified him as an 'outside salesman' under the FLSA."); ***Meza v. Intelligent Mexican Mktg.,*** 720 F.3d at 577, 577-87 (5th Cir. 2013); ***Krispy Kreme Doughnut Co.,*** 346 F.Supp.1102 (M.D.N.C. 1972)(doughnut salesmen were exempt outside salesmen when they order products for customers based on customers' needs and other factors, call on customers and engaged in various activities to increase sales with existing customers, and received compensation commensurate with sales, among other).

### a.  A Distributor's Primary Duty Is Making Sales

The undisputed facts establish that Distributors' primary duty is making sales; indeed, distributors earn money by purchasing product from Defendants and selling that product to customers in their territory. ***See SOMF ¶¶8-12.*** Distributor efforts are focused on making and increasing sales.

When Distributor Noll had a new product, he would try to develop that brand in his territory: "Some didn't sell as well as others, but that didn't stop [him] from trying." He would also ask accounts if they had additional space or display area to try to increase sales *See SOMF ¶13*.

Distributor Dore "definitely" wants to increase his sales and has been able to grow his sales and shelf space by providing excellent customer service; he has also taken an account representative out for lunch and donates products from his company at the holidays or for his customer's employee appreciation barbecues, in an effort to maintain good relations with the customer. He takes opportunities to gain additional displays and will take advantage of a competitor's empty shelf space by asking permission from the manager to stock his product there instead. *See SOMF ¶14*.  He considers himself to be the dominant bread distributor in his area and is well-known in his small town: he has picked up new accounts by people approaching him to ask about his pricing. *See SOMF ¶20*.

Distributor Swedberg's business has grown since he acquired distribution rights due to increased sales; he has initiated his own sales incentives with some chain accounts, including promotions on sub rolls and bulky rolls at one account, and another promotion on TastyKake that he was working on at the time of deposition. He has also been successful in obtaining extra shelf space and displays at many of his accounts by speaking with the store managers. *See SOMF ¶15*. Distributor Burns tries to maximize sales in his territory and states that sales at his Sam's Club account are up 30% because he was able to get new items into the store, like double packs of butter bread and honey wheat: "[H]e had to pester them for quite some time . . . [h]e showed them how a lot of their employees that worked there were buying the bread as single units at Walmart, and they went to bat and said we should have it in here; we're losing sales.  So . . . the general manager fought to get it in there." *See SOMF ¶16*.

Distributor Lucey tries "every day" to increase sales in his territory: "[his] idea of the best way is good ordering.  If you can nail the orders . . . [y]ou can make more money." *See SOMF ¶17*.

Lucey has tried to increase the number of customers he has in his territory, and has been successful in doing so; he added a restaurant and he added a market by talking to the owner, who shopped at his Hannaford's account. *See SOMF ¶22*.

Distributor Curran talks to store managers about putting his product in where a competitor is leaving shelf space empty: "you're always – you're trying to get as much as you can, different stops." *See SOMF ¶18*. Distributor Landry has tried to get additional shelf space from all of his customers: "[He]'ll try to push the product as much as I can anywhere I can." *See SOMF ¶19*. Distributor Veilleux's business has increased in his territory since hiring his son to assist in operating the distributorship, which has allowed him more time to do a better job and acquire more accounts: "[I]f you're not overtired, you're gonna do a better job and do more . . . .  And you're not afraid to pick up new accounts. . . . we picked up [three new accounts], so those have helped my numbers." *See SOMF ¶21*.

### b.    <u>Distributors Are Customarily And Regularly Engaged Outside of The Warehouses</u>

With respect to prong 2, the undisputed facts establish that Distributors regularly work in their territories, outside Lepage Bakeries' warehouses, as demonstrated by Distributors sales efforts described immediately above.  Distributors who personally service their territories, on delivery days, start their day packing product onto their trucks at the warehouse and usually return to the warehouse at the end of the day to unpack their trucks (trays) and process stales (being sold back to Lepage Bakeries). *See SOMF ¶25.*  Based on the undisputed facts, Opt-In Plaintiffs are exempt from the FLSA overtime provision as a matter of law.

**F.      Opt-In Plaintiff Temm's Claims Are Judicially Estopped**

Opt-In Plaintiff Stephen Temm ("Opt-In Plaintiff" or "Temm") is currently involved in two legal proceedings, the instant matter[12] and a Chapter 13 bankruptcy, and has maintained separate, inconsistent positions in the pending proceedings. Temm's claims should be judicially estopped because his participation in this lawsuit and current claim that he is owed overtime wages is directly contradictory to the representations that he made to the bankruptcy court when he filed his Chapter 13 petition, when he scheduled his assets, when he amended his Schedules B and I, and when his Chapter 13 plan was approved. *See SOMF ¶¶43-58*. Judicial estoppel is warranted where the record demonstrates that (1) the estopping position and the estopped position are directly inconsistent and (2) the responsible party succeeded in persuading a court to accept its prior position. *See Guay*, 677 F.3d at 16; *Alternative Sys. Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 33 (1st Cir. 2004).

Temm has taken inconsistent positions between this current suit and his pending bankruptcy proceedings by concealing the instant causes of action in his petition. Here, Temm has not only represented to his creditors and the bankruptcy court that the current claims do not exist but he also has maintained that he is self-employed by his company, ZNL Distributors Inc. Yet he now seeks overtime wages from Defendants and claims that he was not an independent contractor. These positions are clearly mutually exclusive. The second test of judicial estoppel is met when a court adopts the prior inconsistent statement. A bankruptcy court accepts a prior inconsistent statement when it grants relief to the debtor. *Guay*, 677 F.3d at 18 ("A bankruptcy court 'accepts' a position taken in the form of omissions from bankruptcy schedules when it grants the debtor relief, such as discharge, on the basis of those filings)." The analysis of the second prong is uncontrovertibly straightforward as Temm's bankruptcy plan has been confirmed and he has yet to disclose his interests in the current lawsuit. The bankruptcy court adopted Temm's position that he has no legal interest in

---

[12] These are the only two litigations of which Defendants are currently aware.

overtime wages, that he is self-employed, and that he has no current interest in the outcome of the current lawsuit when it confirmed his Chapter 13 plan on February 26, 2016.

Accordingly, this Court should enter summary judgment as to the claims of Opt-In Plaintiff Temm in favor of Defendants and dismiss his claims with prejudice as a matter of law.

## CONCLUSION

For all of the forgoing reasons, Defendants request that this Court grant their Motion for Partial Summary Judgment and order the entry of judgment for Defendants on all claims for overtime compensation under both federal and state law (Count I and part of Count IV), Count III in its entirety as well as that part of Count IV seeking redress for failure to maintain records under Section 622, Title 26 for lack of a private right of action and Count V (by consent).  Finally, Temm and Degen should be barred from pursuing any claims in this lawsuit.

Dated: May 31, 2019                        Respectfully submitted,

Flowers Foods, Inc., Lepage Bakeries Park Street, LLC and CK Sales Co., LLC,

By their attorneys,


 /s/ Frederick B. Finberg
Peter Bennett, Esquire
Frederick B. Finberg, Esquire
Joanne Simonelli, Esquire
The Bennett Law Firm, P.A.
75 Market Street, Suite 201
Portland, ME  04101
(207) 773-4775

and

Kevin P. Hishta, Esquire
Ogletree, Deakins, Nash, Smoak & Stewart
191 Peachtree St., NE, Suite 4800
Atlanta, GA 30303
(404) 881-1300

Margaret S. Hanrahan, Esquire
Ogletree, Deakins, Nash, Smoak & Stewart
201 South College Street, Suite 2300
Charlotte, NC 28244
(704) 342-2588

## CERTIFICATE OF SERVICE

I, Frederick B. Finberg, hereby certify that on May 31, 2019, I filed the foregoing via the Court's CM/ECF system. The CM/ECF system will provide service of such filing(s) via Notice of Electronic Filing (NEF) to all counsel of record.

 /s/ Frederick B. Finberg
Frederick B. Finberg