UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| TIMOTHY NOLL, individually and, | ) | |
| on behalf of similarly situated | ) | |
| individuals, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:15-cv-00493-LEW |
| | ) | |
| FLOWERS FOODS INC, LEPAGE | ) | |
| BAKERIES PARK STREET, LLC., and | ) | |
| CK SALES CO., LLC, | ) | |
| | ) | |
| Defendants | ) | |

## SUMMARY JUDGMENT ORDER

Plaintiff Timothy Noll, on behalf of himself and similarly situated individuals ("Plaintiffs") filed suit against Flowers Foods Inc., Lepage Bakeries Park Street, LLC, and CK Sales Co., LLC, ("Defendants"), claiming Defendants misclassified Plaintiffs as independent contractors. Plaintiffs allege the classification is contrived, and that Defendants have failed to pay them overtime as required by the Fair Labor Standards Act ("FLSA") and analogous provisions of Maine state law.  Plaintiffs seek damages and equitable relief.

Now pending are Defendants' Motion for Partial Summary Judgment (ECF No. 224) and Plaintiffs' Motion for Partial Summary Judgment (ECF No. 230).  Through their motion, Defendants primarily seek judgment as a matter of law on certain claims based on the motor carrier and outside sales exemptions to the overtime laws, and dismissal of

certain individual Plaintiffs.  For their part, Plaintiffs seek dismissal of Defendants' FLSA outside sales exemption defense, and a finding that a three-year limitation period and liquidated damages are appropriate on the FLSA claim.

For the reasons discussed below, Plaintiffs' motion is denied, and Defendants' motion is granted in part and denied in part.

## LEGISLATIVE BACKDROP

In 1938, Congress passed the Fair Labor Standards Act ("FLSA"), now codified, as amended, at 29 U.S.C. Ch. 8, §§ 201-219.  Congress enacted the FLSA "with the goal of 'protect[ing] all covered workers from substandard wages and oppressive working hours.'" *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 147 (2012) (quoting *Barrentine v. Arkansas–Best Freight Sys.*, *Inc.*, 450 U.S. 728, 739 (1981); *see also* 29 U.S.C. § 202(a).

Among the FLSA's provisions is the requirement that employers "compensate employees for hours in excess of 40 hours per week at a rate of 1 1/2 times the employees' regular wages."  *Hall v. U.S. Cargo & Courier Serv.*, *LLC*, 299 F. Supp. 3d 888, 894 (S.D. Ohio 2018) (quoting *Christopher*, *supra*, and citing 29 U.S.C. § 207(a)).  This is the federal "overtime pay" requirement that employers and employees are familiar with to this day.  The FLSA confers the right to receive overtime pay on "employees," not on all workers generally.  29 U.S.C. § 207(a).  Independent contractors, for example, are not covered.  Nor are employees in a host of occupations, such as school teachers, agricultural and fishery workers, telephone switchboard operators, certain computer programmers, border patrol agents, and others whom Congress has exempted from the benefit of federal overtime law.  *Id.* § 213.  Whether a given worker is a covered employee entitled to overtime is a case-

specific inquiry. *Bolduc v. Nat'l Semiconductor Corp.*, 35 F. Supp. 2d 106, 114 (D. Me. 1998); *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 912 (S.D.N.Y. 2013).

The FLSA provides workers who believe they have been denied overtime compensation the right to bring a civil action in a federal or state court of competent jurisdiction. 29 U.S.C. § 216(b). FLSA plaintiffs often include workers who contend they have been "misclassified" as something other than an employee (most commonly, an independent contractor), and that, by rights, they should be compensated as employees based on the economic reality of their working relationship with the employer. In general, "[w]here the work done, in its essence, follows the usual path of an employee, putting on an 'independent contractor' label does not take the worker from the protection of the Act." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947). Workers who succeed in proving an employer misclassified them may be able to recover an award of unpaid overtime wages and additional remedies, including liquidated damages in an amount equal to the unpaid overtime wages. 29 U.S.C. § 216(b). Maine law is to like effect. *See* Me. Rev. Stat. ("M.R.S."), tit. 26, ch.7.

This case presents a paradigmatic "misclassification" claim. Plaintiffs allege an employment contract with all three Defendants, Complaint ¶¶ 7 – 9, to perform work described in distributor agreements that, Plaintiffs say, misclassify them as independent contractors. Plaintiffs contend the distributor agreements misclassify them so that the Flowers Foods enterprise can avoid the expense of paying overtime compensation for work that cannot be completed in a 40-hour work week.

## SUMMARY JUDGMENT FACTS [1]

Defendant Flowers Foods, Inc., is a publicly traded corporation that operates nationally in the baked foods category.  Defendant Lepage Bakeries Park Street, LLC, is a wholly-owned subsidiary of Flowers Foods.  Defendant CK Sales Co., LLC, is a wholly-owned subsidiary of Lepage Bakeries.  Through the subsidiaries that make up its corporate tree (including additional subsidiaries other than those named here as defendants), Flowers Foods produces fresh breads, buns, rolls, and snack cakes and distributes these products to retail and foodservice customers throughout the United States.  Plaintiffs' participation in this enterprise involves the Maine-based "direct-store-delivery" segment of Defendants' business, part of Defendants' nationwide bakery network involving "a highly developed reciprocal baking system (where bakeries can produce for [their] market[s] and th[ose] of other bakeries within the direct-store-delivery network)."  Flowers Foods SEC Form 10-K at 5 (ECF No. 231-1).

Flowers Foods extended its network into Maine in 2012, with its acquisition of Lepage Bakeries.  Starting in the fall of 2013, Flowers Foods—through its subsidiaries Lepage Bakeries and CK Sales—began selling[2] franchised distribution rights and, when it

---

[1] The summary judgment facts are drawn from the parties' stipulations, if any, and from their statements of material facts submitted in accordance with Local Rule 56.  The Court will adopt a statement of fact if it is admitted by the opposing party and is material to the dispute. If a statement is denied or qualified by the opposing party, or if an evidentiary objection is raised concerning the record evidence cited in support of a statement, the Court will review those portions of the summary judgment record cited by the parties, and will accept, for summary judgment purposes, the factual assertion that is most favorable to the party opposing the entry of summary judgment, provided that the record material cited in support of the assertion is of evidentiary quality and is capable of supporting the party's assertion, either directly or through reasonable inference.  D. Me. Loc. R. 56; *Boudreau v. Lussier*, 901 F.3d 65, 69 (1st Cir. 2018).

[2] The terms of sale are not clear from the summary judgment papers.  However, through the agreements Plaintiffs acquired ownership interest in distribution rights in their territories, and may sell the same, subject to a right of first refusal held by CK Sales.  Sample Distributor Agreement § 15.1.

retained a new distributor, it did so through distributor agreements with CK Sales.  The agreements entitle Plaintiffs to sell and distribute Defendants' branded products in Plaintiffs' respective geographic territories in Maine.  Sample Distributor Agreement (ECF No. 225-2).  An "essential term" of the agreement is that distributors are understood to be "common law independent contractor[s]."  *Id.* § 16.1.

In addition to classifying distributors as independent contractors, the distributor agreements assign each distributor a defined geographic area, making the distributor responsible for sales, deliveries, and service within that area.  The distributor agreements also include stipulations regarding the working relationship between each distributor and, nominally, CK Sales.  For example, CK Sales may change the "terms and prices" of their sales to distributors "at any time"; distributors must use their "best efforts to develop and maximize" sales of "authorized products" in accordance with "good industry practice," and "cooperate" with marketing and sales efforts; CK Sales has the right to "solicit and drop delivery accounts, in whole or in part" from the distributors' territory for "legitimate business reasons"; CK Sales will determine the warehouse location where distributors collect product; distributors must provide their own delivery trucks; deliveries need not be "conducted personally," so that distributors are "free to engage" outside assistance; CK Sales may terminate the agreement if the distributor "fails to perform [the] obligations under this Agreement"; and CK Sales may issue notices where it finds a distributor to be in breach of the agreement.  Sample Distributor Agreement at 3 – 17.

Per the agreements, Plaintiffs earn money by "purchasing" product at a specified discount and "selling" it at a higher price to customer stores.  For major accounts, however,

Defendants control both the price at which Plaintiffs buy and the price at which they sell products.  To fulfill their obligations, Plaintiffs submit orders to LePage Bakeries on behalf of their customers' accounts, pick up the products from designated LePage warehouses shortly after the products arrive, drive the products to customers' locations, deliver products to the shelves in customers' stores, and periodically manage the inventory of products ("stock") at those stores to ensure a steady supply of fresh product. [3]

Plaintiffs and Defendants track orders and deliveries using handheld computers issued by Defendants, who maintain a database generated by the computers.  On a weekly basis, Defendants "settle" accounts for each Plaintiff based on the margin established by the prices at which Defendants sell products to Plaintiffs and the sale price established for the products at the customer stores, subject to certain "chargebacks, credits and adjustments."  Sample Distributor Agreement § 8.1.  Because distributors' earnings are determined largely by the difference between the amount of sales to customers, Plaintiffs' income is primarily a function of the volume of products sold to customers.

The parties dispute the extent to which distributors can impact the total volume of sales in their territories through their own efforts, but it is undisputed that the overwhelming majority of product is sold to the large, chain retailers who are Defendants' primary accounts.  Plaintiffs have testified that, for each existing customer account, Defendants compile a "suggested order," listing recommended products, prices, and volumes, and upload the suggested order onto the handheld computer.  Pls.' Statement ¶ 30.  On the one

---

[3] Plaintiffs are permitted to return stale product to LePage and receive a credit to their account so that Plaintiffs are not financially responsible for product that expires before it is sold at the large chain accounts.

hand, several Plaintiffs—including Noll, Dore, Swedberg, Burns, Lucey, Veilleux, and Curran—indicated they felt they had some degree of control over the content of the orders, and could or did change the orders, including by trying to independently increase sales in their territories. *See* Defs.' Statement ¶¶ 13 – 22. Other Plaintiffs, however, have indicated Defendants leave them little to no discretion to deviate from the suggested orders preloaded on their handheld computers. Pls.' Responsive Statement ¶ 17. The parties also paint contrasting pictures of Plaintiffs' ability to add new customers through independent sales activity. Some Plaintiffs have added new accounts through their own efforts, but others testified they were not permitted to do so.

In the aggregate, approximately 95 percent of total sales are generated by large chain accounts like Hannaford and Walmart, which accounts acquire products on a credit basis through separate agreements with Defendants. Pls.' Statement ¶ 42. The parties agree that Defendants have primary responsibility for setting the terms for pricing, products, and volumes, as well as setting delivery expectations and customer requirements, for these large accounts. By contrast, distributors exercise greater influence over their small cash accounts, which include restaurants and smaller grocery outlets and convenience stores.

Plaintiffs' deposition testimony indicates there is variation among distributors' day-to-day schedules and work experience. For example, some distributors hire assistants to help with their routes, though many do not. While most personally service their routes, their contention that they are controlled is not a function of Defendants telling them what to do and when to do it, but rather a function of the significant expectations set by Defendants' service requirements and customer expectations.

Plaintiff Noll has described the typical schedule of a typical day on his route. Noll Dep. at 80. So has opt-in Plaintiff Landry, who observed that not everyone picks up their morning order at the same time (he begins his day at 4:00 a.m.). Landry opined that schedules depend in part on customers, and not everyone gets an early start like he does. Landry Dep. at 46 (ECF No. 226-4). Curran says his days vary in length, and he likes to "get three or four little stops done" before his major account. Curran Dep. at 55. Dore acknowledged that he could make his own schedule during the day, but that customer expectations necessarily impose limitations. For example, he would not deliver to a restaurant during its lunch-time rush and a major account might "get after you" if you arrive too late in the day. Dore Dep. at 122 (ECF No. 255-9).

All Plaintiffs who are members of the FLSA opt-in collective action have stated that their obligations to Defendants regularly require them to work beyond 40 hours per week, but those hours varied significantly among Plaintiffs.

Pursuant to the distributor agreements, Plaintiffs purchase and insure their own delivery trucks. These trucks have a "gross vehicle weight rating" or "gross vehicle weight" that exceeds 10,001 pounds. Plaintiffs' delivery routes are entirely intrastate. Although many of the products distributed by Plaintiffs are produced in bakeries located in Maine, a steady stream of products distributed by Plaintiffs are produced in bakeries located outside of Maine.[4] The out-of-state bakeries, components of the Flowers Foods

---

[4] Defendants cite the declaration of Gilbert Michael Brock, a Vice President of Sales for Lepage Bakeries, as evidence that several products Plaintiffs deliver are baked out-of-state. Specifically, Mr. Brock declares:

> A number of products ordered by CK Sales Distributors … are produced by bakeries outside the State of Maine. The products produced by these out-of-state bakeries include … Country Kitchen, Barowsky's, Nature's Own, Wonder Bread and TastyKake.

network, ship their products to Lepage Bakeries facilities according to the product orders Plaintiffs relay through Lepage Bakeries.  Products shipped to Lepage remain with Lepage for a matter of hours (occasionally as many as 48 hours) before Lepage employees ship them to the warehouses where Plaintiffs pick them up for distribution. [5]  In this way, although Plaintiffs drive intrastate routes, they carry products that move in interstate commerce based on recurring customer orders.

Plaintiffs make deliveries five days a week, and on the other two days of the week they perform "recalls" or "pull ups" (two alternative names for the same thing) to adjust the stock on the shelves in the major customers' stores.  Some Plaintiffs use personal vehicles once or twice a week to perform "pull ups" or "recalls." These personal vehicles weigh less than 10,001 pounds.  During pull ups, Plaintiffs will sometimes (the frequency is not demonstrated) pull out-of-code product from the market and replace it with new inventory.  They may also deliver product in response to notification that a customer "requires additional product to get through the day."  Gilbert Dep. at 174 (ECF No. 237-3)

---

Defs.' Statement ¶ 28 (ECF No. 225); Brock Decl. ¶ 9 (ECF No. 229-4).  Plaintiffs argue I should strike Mr. Brock's declaration because it does not indicate what proportion of the products distributed by Plaintiffs moved in interstate commerce. Pls.' Response to Defs.' Statement ¶ 28 (ECF No. 245).  However, they have not persuasively demonstrated that it would matter, legally, that most of the products they distribute are baked in Maine.  The fact that the deliveries include products shipped in from outside the state is material to the application of the Motor Carrier Act exemption, because the transportation of interstate products informs that issue.  There are no requirements that an employee work exclusively, or mostly, with products transported in interstate commerce.  *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 674–75 (1947) ("It is the character of the activities rather than the proportion of either the employee's time or of his activities that determines the actual need for the [Secretary of Transportation]'s power to establish reasonable requirements with respect to qualifications, maximum hours of service, safety of operation and equipment."); *Crooker v. Sexton Motors, Inc.*, 469 F.2d 206, 209 (1st Cir. 1972).

[5] Defendant Lepage Bakeries is registered with the U.S. Department of Transportation as a motor private carrier, with DOT Number 94424.

(cited by Plaintiffs in support of their statement that distributors "occasionally deliver additional product, using their personal vehicles"); Pls.' Statement ¶ 31 (ECF No. 238). [6]

Opt-in Plaintiff Ernest Dore testified that he uses a personal vehicle "not that often" to deliver product, but has done so when his delivery truck broke down or when, on occasion, a customer called him to report the stock of a particular product was about to run out. Dore Dep. at 171; Defs.' Statement ¶ 34 (ECF No. 225). Opt-in Plaintiff Normand Belanger testified he used his 2008 Isuzu box truck for his two weekly pull ups at his Walmart account, if he needed to deliver product on those days. If he did not need to deliver product, he used his personal vehicle. Belanger Dep. at 97 (ECF No. 226-6); *see also* Stipulation ¶ 3 (ECF No. 229) (Isuzu reference is a box truck reference). Opt-in Plaintiff Richard Curran testified he uses a "personal truck" for recalls at Hannaford, but it is not evident from the deposition transcript excerpt that he delivers any product to Hannaford when he performs recalls. Curran Dep. at 118 – 120 (ECF No. 226-3). According to Curran, on recall days he does not deliver product but rather "retrieve[s] stuff from the back room o[f] [his] major stop." *Id.* at 55. Plaintiffs also admit Defendants' assertion that Opt-in Plaintiff Clifford Cyr used a personal vehicle only to commute to customers on Wednesdays and Sundays, but not to deliver product. Defs.' Statement ¶ 33; Pls.' Responsive Statement ¶ 33; Cyr Dep.  at 104 – 105 (ECF No. 226-7). Plaintiff

---

[6] Certain of Plaintiffs' accounts, most notably Hannaford's and Walmart, require shelf and display attention every day, including "restocking," if necessary. But two days per week these duties involve less-intensive "pull ups" or "recalls" to adjust the shelves. Pls.' Statement ¶ 31; Defs.' Responsive Statement ¶ 31 (ECF No. 242). Plaintiffs have cited the deposition testimony of Jerry Gilbert, evidently someone who exercises some manner of managerial oversight for one of the Defendants (the deposition excerpt does not include Mr. Gilbert's title). Mr. Gilbert testified that distributors can be expected to deliver some product even on the pull up or recall days, but he did not address the issue of personal vehicle usage. Gilbert Dep. at 174 – 175 (ECF No. 237-3).

Timothy Noll testified that he and his daughter used personal vehicles for pull ups at his Hannaford's account, but he described the pull up days as non-delivery days and stated that they never used the personal vehicles to deliver product.  Noll Dep. at 43 – 54 (ECF No. 225-4).  Opt-in Plaintiff Paul Masse testified that he has only ever delivered product using his personal vehicle for "emergencies," and described one occasion when he used his personal pickup truck during a major snowstorm.  Masse Dep. at 60 – 61 (ECF No. 226-8).

## PLAINTIFFS' CLAIMS

The Complaint (ECF No. 1) contains four counts:

Count I – a collective claim for violation of the overtime provision of the Fair Labor Standards Act, 29 U.S.C. § 207, in which it is alleged that "Plaintiff and the FLSA Collective Class routinely drive or drove their personal vehicles for work," and that they, "either regularly or from time to time, worked more than 40 hours per week, but did not receive overtime pay," Complaint ¶¶ 60, 62;

Count II – a claim requesting a declaratory judgment that Defendants have misclassified Plaintiffs as independent contractors, Complaint ¶ 68;

Count III – a claim for all statutory and equitable remedies purportedly available to Plaintiff and the Rule 23 Class based on alleged violations of 26 M.R.S. §§ 591-A and 1043(11)(E), Complaint ¶¶ 70 – 72; and

Count IV – a claim for non-payment of wages on behalf of Plaintiff and the Rule 23 Class, pursuant to 26 M.R.S. §§ 621, 621-A, 629, and 664, and for other relief purportedly available pursuant to 26 M.R.S. § 622.

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As cautioned by the Supreme Court, "the mere existence of

some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby*, *Inc*., 477 U.S. 242, 247-48 (1986).   A material fact is one that has the potential to determine the outcome of the litigation.  *Id.* at 248; *Oahn Nguyen Chung v. StudentCity.com*, *Inc.*, 854 F.3d 97, 101 (1st Cir. 2017).  To raise a genuine issue of material fact, the party opposing summary judgment must demonstrate that the record contains evidence that would permit the finder of fact to resolve the material issues in its favor.  *See Triangle Trading Co. v. Robroy Indus.*, *Inc.*, 200 F.3d 1, 2 (1st Cir. 1999) ("Unless the party opposing a motion for summary judgment can identify a genuine issue as to a material fact, the motion may end the case.").

The parties' motions offer up for resolution, principally, the following two questions:

> (A)  Do the undisputed facts call for application of the federal or state outside sales exemptions to federal and state overtime law, or have Plaintiffs raised genuine issues of material fact that might negate the exemptions.

> (B)  Do the undisputed facts call for application of the Motor Carrier Act (MCA) exemptions to federal and state overtime law and, if so, have Plaintiffs raised genuine issues of material fact regarding the Technical Corrections Act exception to the MCA exemptions.

As the moving party, Defendants bear the burden of establishing they are entitled to the exemptions.  *Meacham v. Knolls Atomic Power Lab*., 554 U.S. 84, 91 – 92 (2008); *Marzuq v. Cadete Enters.*, 807 F.3d 431, 438 (1st Cir. 2015).  Although Plaintiffs urge me to interpret the federal exemptions narrowly and against the Defendants, citing *De Jesus– Rentas v. Baxter Pharmacy Services Corp.*, 400 F.3d 72, 74 (1st Cir. 2005), the Supreme

Court has held that "[b]ecause the FLSA gives no 'textual indication' that its exemptions should be construed narrowly, there is no reason to give [them] anything other than a fair (rather than a 'narrow') interpretation." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018); *Sec'y of Labor v. Timberline S.*, *LLC*, 925 F.3d 838, 850 (6th Cir. 2019). I therefore give the federal exemptions their fair interpretation as indicated by the text of the statute.

When discussing the exemptions, I will accept, for purposes of the summary judgment analysis only, that Plaintiffs will be able to persuade the finder of fact that they are employees rather than independent contractors.  This approach is necessary and appropriate because Defendants' motion does not challenge Plaintiffs' contention that they are common law employees and because it is essential to Plaintiffs' claims that they ultimately succeed in proving their employee status.

## A.  OUTSIDE SALES EXEMPTIONS

Defendants argue Plaintiffs are exempt from overtime compensation under the FLSA's "outside sales" exemption, 29 U.S.C. § 213(a)(1), and a related provision of Maine law, 26 M.R.S. § 663(3)(C).  I conclude that there is a genuine issue whether the federal outside sales exemption applies, but that the undisputed evidence calls for application of the state law exemption.

### 1.  FLSA Outside Sales Exemption

The FLSA exempts from overtime an employee working "in the capacity of outside salesman." 29 U.S.C. § 213(a).  An outside salesman is one "whose primary duty is making sales within the meaning of section 3(k) of the [FLSA]" and is "customarily and regularly

engaged away from the employer's place of business in performing such primary duty." 29 C.F.R. § 541.500.  Department of Labor regulations include a regulation devoted to "drivers who sell," but, frankly, the regulation raises as many questions as it answers.  *See* 29 C.F.R. § 541.504.  Another regulation advises that the "determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." 29 C.F.R. § 541.700(a).  One must also consider what it means to perform sales activity.  The FLSA defines "sale" or "sell" to include "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k).

Having considered the applicable factors outlined in 29 C.F.R. § 541.504(b), I conclude that the record does not contain sufficient information on the factors, the factors are inapplicable, or the factors do not conclusively determine whether "making sales" is Plaintiffs' primary duty.  Thus, summary judgment is not appropriate on the federal outside sales exemption.

## 2. Maine's Outside Sales Exemption

Under Maine law, employers are exempted from paying overtime to "[e]mployees whose earnings are derived, in whole or part, from sales commissions and whose hours and places of employment are not substantially controlled by the employer."  26 M.R.S. §663(3)(C).  Maine's exemption differs in two significant ways from the exemption found in the FLSA.  First, Maine requires that employees' earnings be "derived in whole or part from sales commissions," unlike the FLSA which exempts employees "whose primary duty is making sales."  Second, Maine law requires that "hours and places of employment

are not substantially controlled by the employer," rather than requiring that employees be "customarily and regularly engaged away from the employer's place of business." *Compare* 29 C.F.R. § 541.500 *with* 26 M.R.S. § 663(3)(C).

### a. *Earnings derived from sales commissions*

To be entitled to judgment under Maine's outside sales exemption, Defendants must demonstrate the absence of a genuine issue of material fact on both requirements of Maine's statutory exemption. The first—that the employees' earnings be derived, in whole or in part, from sales commissions—is not defined elsewhere in the statute. Maine's rules of statutory interpretation require that words in a statute be given "their plain, common, and ordinary meaning." *Palmieri v. Nynex Long Distance Co.*, 437 F.3d 111, 116 (1st Cir. 2006). "Commission," as it is commonly understood, means "[a] fee paid to an agent or employee for a particular transaction, usually as a percentage of the money received from the transaction." Black's Law Dictionary 286 (8th ed.).

According to Plaintiffs, they do not earn commissions on sales because they are not principally involved in solicitation of sales, given that they are not trained to perform sales activity, sales to the major chain accounts are overseen by others, distributor sales activity is not monitored or evaluated, and some distributors are instructed not to discuss sales with their chain accounts. Pls.' Opposition at 27; Pls.' Motion for Partial Summary J. at 3 – 7.

The question is whether Plaintiffs, if regarded as employees, would also be regarded, as a matter of law, as receiving compensation based, in whole or in part, on sales commissions. The undisputed evidence demonstrates that regardless of whether Plaintiffs comprise a sales force, Defendants pay Plaintiffs a commission based on the net sales

15

occurring in Plaintiffs' territories.  That is, Plaintiffs' compensation is derived from an accounting process that affords them a fee measured by the volume of sales in their territories.  For purposes of Maine law, sales commissions are "in part" how Plaintiffs receive their compensation.

### b.   Defendants' control over employees' hours and places of employment

The undisputed evidence also satisfies the second element of the Maine outside sales exemption; the requirement that Defendants do not "substantially" control the "hours and places of [Plaintiffs'] employment."  26 M.R.S. § 663(3)(C).  Although the Maine statute does not define these terms, the First Circuit has interpreted the relevant language.  Giving the words their "plain, common, and ordinary meaning," the Circuit interpreted "control" to mean "exercise restraining or directing influence over" or "have power over."  *Palmieri*, 437 F.3d at 116.  The Circuit clarified that "[s]ubstantially," the adverb modifying "control," means "considerable in quantity" or "significantly great."  *Id*.  Effectively, the Circuit "confine[d] the reach of substantial control to those situations in which the employer actually articulates specified work hours and locations."  *Id.*  In *Palmieri*, that meant a plaintiff who did not have to work "for a set number of hours," or in a particular location, and was given "substantial latitude to work as he saw fit" was not "substantially control[led]" under § 663.  *Id*.

Plaintiffs have as much control, if not more, over where and when they work than the plaintiff in *Palmieri*.  For example, Plaintiffs are not required to personally service their territories, and can hire others to perform their deliveries and pull ups.  Some Plaintiffs even own multiple territories and engage others on a full-time basis to operate the

territories.   And regardless of how Plaintiffs structure their businesses, each distributor determines his or her own hours, including start times and total hours worked, subject to ordinary scheduling constraints imposed by the customers and the demands of the work itself (rather than Defendants).

Plaintiffs respond that their work days are set by Defendants, including the need to perform pull ups on off days, and that Defendants require Plaintiffs to obtain permission to change the days they service the national or chain accounts.  Pls.' Additional Stmt. of Material Facts ¶ 13.  No doubt, Defendants set the general framework for Plaintiffs' employment, but they do not substantially control hours and places of employment.  The summary judgment record is clear that as long as Plaintiffs make their deliveries they can do so on their own schedule, and in whatever order they please.  Defendants have no control over who performs these deliveries, or over Plaintiffs' schedules, meaning they exercise even less control than the defendant-employer in *Palmieri*.  Because there are no disputed material facts surrounding whether Defendants control Plaintiffs' hours and places of work Defendants have shown they do not have the "substantial[] control" required under Maine law.

Because Defendants have met their burden on both elements of Maine's outside sales exemption, § 663(3)(C), I grant Defendants motion for judgment as a matter of law on Count IV.[7]

---

[7] Defendants also move for judgment as a matter of law against the Rule 23 class based on Maine's perishable food exemption to overtime protections, 26 M.R.S. § 664(3)(F).  Simply stated, because the finder of fact could conclude that Plaintiffs load product but do not "pack" product (because product is pre-packaged), the perishable foods exemption does not negate Plaintiffs' state law overtime claim.  Nevertheless, the point is immaterial given application of the Maine outside sales exemption.

## B.  MOTOR CARRIER ACT EXEMPTIONS

Defendants contend they are exempt from the overtime pay requirements of the FLSA because Plaintiffs' job duties affect the safety of operation of commercial motor vehicles in the transportation of passengers or property in interstate commerce and, therefore, Plaintiffs' working hours are subject to regulation by the Secretary of Transportation under the Motor Carrier Act ("MCA").  *See* 29 U.S.C. § 213(b)(1); 49 U.S.C. § 31502.  While Plaintiffs do not dispute that their distribution activity affects the safety of operation of commercial motor vehicles in transportation, they do dispute that Defendants qualify as motor private carriers and employ Plaintiffs to engage in interstate commerce.  In the event they lose these arguments, Plaintiff argue their work activity falls under the Technical Corrections Act ("TCA") exception to the MCA exemption.

### 1.    The MCA Exemption

This case involves one MCA exemption existing in federal law and another existing in state law.  Because Maine law tracks federal law this discussion is limited to the federal exemption.[8]

The FLSA provides an exemption from its overtime requirements for "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 [the Motor Carrier Act]."  29 U.S.C. § 213(b).  The MCA identifies the types

---

[8] Maine's gloss on the MCA exemption requires an additional finding that the driver not be paid hourly. 26 M.R.S. §664(3)(K).  Otherwise, Maine's exemption is identical to the exemption in federal law.  *See Smith v. Schwann's Home Service, Inc.*, No. 2:13-cv-231, 2014 WL 6679129, *27-30 (D. Me. Nov. 25, 2014) (analyzing federal and state MCA exemptions under federal law).  The parties agree that Plaintiffs are not paid hourly.

of carriers over whom the Secretary has jurisdiction, including those defined in 49 U.S.C.

§ 13501, and it provides that the Secretary has authority to prescribe the "qualifications

and maximum hours of service of employees of . . . a motor carrier," *id.* § 31502(b)(1), or

"motor private carrier," *id.* § 31502(b)(2).  *See also* 49 U.S.C. § 31136(a) (calling on the

Secretary of Transportation to prescribe safety regulations for commercial motor vehicles).

An employee's transportation activity may come within the Secretary of Transportation's

power to regulate, even if the Secretary has not yet found a need to exercise that power.

*Southland Gasoline Co. v. Bayley*, 319 U.S. 44, 47 – 48 (1943).

To escape FLSA liability based on the MCA exemption, an employer must show it

qualifies for the exemption.  *Timberline*, 925 F.3d at 850.  Here, that burden requires a

showing that Defendants, assuming they employ Plaintiffs, are motor private carriers, and

that Plaintiffs' work involves "the safety of operation of [commercial[9]] motor vehicles in

the transportation on the public highways of passengers or property in interstate or foreign

commerce within the meaning of the Motor Carrier Act."  29 C.F.R. § 782.2(a).

The MCA defines "motor private carrier" as a person "transporting property by

motor vehicle when: (A) the transportation is as provided in section 13501 of this Title

---

[9] The need for a "commercial" vehicle is in reference to the Secretary's authority to regulate the hours of those who operate motor vehicles having "a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds." 49 U.S.C. § 31132(1)(A).  On August 10, 2005, Congress enacted the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA–LU"). Pub. L. No. 109–59, 119 Stat. 1144. SAFETEA-LU amended the definition of "motor private carrier" to mean "a person, other than a motor carrier, transporting property by commercial motor vehicle[.]" 49 U.S.C. § 13102(15) (2005). The term "commercial motor vehicle" is elsewhere defined as a "self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle has a gross vehicle rating or gross vehicle weight of at least 10,001 pounds, whichever is greater." *Id.* at § 31132(1)(A). It is undisputed that Plaintiffs' delivery trucks are commercial vehicles of the requisite weight.

[describing the Secretary's jurisdiction over interstate transportation]; (B) the person is the owner, lessee or bailee of the property being transported; and (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise. 49 U.S.C. § 13102(15). These, then, are the ABCs of Defendants' summary judgment burden.

Plaintiffs argue Defendants have failed to carry their evidentiary burden at summary judgment to show the absence of disputed material facts as to A and B. Pls.' Opposition Mem. at 29 (ECF No. 244). Defendants believe their status as a motor private carrier is self-evident if Plaintiffs are their employees: "There is no question that, if Plaintiffs are/were employees, then the Defendants clearly satisfy the definition of a motor private carrier." Defs.' Motion at 25. Given the undisputed facts, I agree with Defendants that, once Plaintiffs are understood to be employees of any one of the Defendants, the issue resolves in Defendants' favor as a matter of law.

### a. Whether Plaintiffs' transportation activity falls within the Secretary's authority?

Transportation activity comes within the Secretary's "general jurisdiction" when it involves the carriage of property, in commercial vehicles, in interstate commerce. 49 U.S.C. §§ 13102(15)(A), 13501. Although Plaintiffs concede that their delivery trucks qualify as commercial vehicles, Plaintiffs argue they do not carry property in interstate commerce because their routes are entirely *intra*state.

The undisputed facts demonstrate that Plaintiffs carry out the final leg of the transportation of interstate products shipped to fulfill the existing orders of readily ascertainable customers. Consequently, Plaintiffs are engaged in interstate commerce notwithstanding the brief stopover of the products in warehouses along the interstate route.

A solid bulwark of precedent and regulatory authority support this conclusion. *See*, *e.g.*, *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 569 (1943); *Timberline*, 925 F.3d at 850 (6th Cir. 2019); *Collins v. Heritage Wine Cellars*, *Ltd.*, 589 F.3d 895, 900 (7th Cir. 2009); 29 C.F.R. § 782.7(b) ("Interstate commerce requirements of exemption"); U.S. Dep't of Labor, Field Operations Handbook § 24d02(b) (Rev. 690, May 23, 2016) ("Handbook").

As explained in the Department of Labor regulation and the Handbook, intrastate transportation of property will empower the Secretary to regulate the shipper as a carrier, if the shipper has a "fixed and persistent transportation intent," Handbook § 24d02(b), to cause the property in question to undergo "a 'practical continuity of movement' across State lines from the point of origin to the point of destination," 29 C.F.R. § 782.7(b)(1), even if the shipper only employs persons to carry out an intrastate leg of the transportation route. Thus, highway transportation is within the Secretary's authority "where the vehicles do not actually cross State lines but operate solely within a single State, if what is being transported is actually moving in interstate commerce …; the fact that other carriers transport it out of or into the State is not material." 29 C.F.R. § 782.7(b)(1).

The Department's Handbook uses the shipment of bakery products as an example of when "the shipper is also the importer," making its local delivery routes subject to the Secretary's general jurisdiction:

> In some situations the shipper is also the importer, as would be the case where a manufacturer, such as a bakery, produces goods in one state and moves them through his distribution point in another state to his customers in that state [and] [t]he employer, as the shipper, knows at the time of the shipment what he intends to do with the goods after they reach his out-of-state distribution point. If, as would normally be the case, there is a practical continuity of movement of the out-of-state goods through the firm's

distribution point to its customers, this is sufficient to establish a "fixed and persisting transportation intent" beyond the distribution point.

"Transportation of commodities from terminal storage," U.S. Dep't of Labor, Field Operations Handbook § 24d02(b) (Rev. 690, May 23, 2016), *available at* https://www.dol.gov/whd/FOH/FOH_Ch24.pdf.

Where the "shipper" has this fixed and persisting intent to transport products interstate to reach identifiable customers in fulfillment of existing orders, as is the case here based on undisputed evidence, the shipper's employees who drive intrastate legs in commercial vehicles haul in the Secretary's domain. Indeed, the rule is broad enough to cover even shipments designed merely to meet "projections of customer demand that have some factual basis." *Ehrlich v. Rich Prod. Corp.*, 767 F. App'x 845, 849 (11th Cir. 2019) (citing Motor Carrier Interstate Transportation – From Out-of-State Through Warehouses to Points in Same State, 57 Fed. Reg. 19812-01 (May 2, 1992)).

The fact that Defendants tricked out their interstate carriage system by breaking it into multiple component parts overseen by different affiliated entities does not aid Plaintiffs. Whether Plaintiffs are employed by one defendant, two defendants, or all three defendants, the fact remains that Plaintiffs are employed by one or more shippers to carry out the final leg of an interstate transportation program. *See*, *e.g.*, *Foreman v. Five Star Food Serv.*, 950 F. Supp. 2d 958, 968-70 (M.D. Tenn. 2013) ("[C]ircumstances matter, including whether the original shipping entity or entities controlled, either directly or through affiliates, the ultimate intrastate destination of the products during and after the

22

products crossed state lines.")[10]; *Musarra v. Digital Dish*, *Inc.*, 454 F. Supp. 2d 692, 706 (S.D. Ohio 2006) (technicians for local DISH Network subsidiary were covered by the MCA, where DISH Network shipped goods interstate to its subsidiary's distribution center and subsidiary's technicians shipped goods to DISH Network's designated customers).

In *Bilyou v. Dutchess Beer Distributors*, *Inc.*, 300 F.3d 217 (2d Cir. 2002), the Second Circuit affirmed a grant of summary judgment to the employer of a plaintiff who transported empty bottles and containers entirely within the State of New York because the employee's transportation activity "was merely one leg of a route to an out-of-state destination" overseen by his employer's parent organization. *Id.* at 224 – 25. The circuit opined that the presence of distinct entities overseeing different legs of an interstate journey could make a difference where those entities operate "at arm's length," but it could not see how the Secretary's jurisdiction could be thwarted where the entities are "interrelated" with "common owners [who] share the same property[] and arrange with one another [to] allocate[e] the benefits and burdens of handling" the property being carried. *Id.* at 225. The logic of this rule is sound. The general jurisdiction of the Secretary of Transportation over motor private carriage cannot depend on the manner in which commercial enterprises divvy up portions of an interstate route among subsidiaries and affiliates.

In this case, not only is it undisputed that Defendants are affiliated entities, but it is also Plaintiffs contention that each Defendant employs Plaintiffs. Indeed, the success of

---

[10] In *Foreman*, District Judge Trauger initially denied the defendant's motion for summary judgment, but granted the defendant's motion for reconsideration and accepted supplemental evidence offered on the defendant's MCA exemption defense, ultimately granting summary judgment. *See* 2013 U.S. Dist. Lexis 150182.

Plaintiffs' FLSA claim depends on Plaintiffs' contention that they will be able to prove at trial that they are the common law employees of at least one of the Defendants. Unfortunately for them, such a finding would bolt down the wheels of the interstate commerce component of the MCA exemption because it would mean Plaintiffs are employed by a shipper to complete the intrastate leg of the interstate shipment of property bound for specific customers in fulfillment of existing orders.

### b.  Who is the owner, lessee or bailee of the property?

Congress has defined a motor private carrier as a "person" who transports property interstate in the capacity of owner, lessee, or bailee, with the intent to sell, lease, rent, or bail the property, or simply to "further a commercial enterprise."  49 U.S.C. § 13102(15). Pointing to the terms of the Distributor Agreement, specifically that portion stating they purchase and own the products they deliver,[11] Plaintiffs argue there is a genuine issue of material fact whether Defendants can prove they are owners, lessees, or bailees of the interstate bakery products after Plaintiffs take possession of the products.

I am not persuaded that the purported allocation of ownership to Plaintiffs is the silver bullet Plaintiffs think it is.  Nor am I persuaded that the question is one for a jury to

---

[11] For example, the sample Distributor Agreement reads:

> 4.1 Products and Authorized Products will be sold to DISTRIBUTOR at such  terms and prices as established by COMPANY from time to time. Title and risk of loss shall pass to DISTRIBUTOR upon delivery to DISTRIBUTOR.

ECF No. 225-2 at 6.  Defendants' representative Gilbert Brock, a Vice President of Sales for Lepage Bakeries, confirmed this relationship in his declaration. Brock Decl. ¶ 8 (ECF No. 229-4 at 5).

resolve.  The question is one of law, and the answer puts the hammer down on the MCA exemption.

In the first place, even if I embrace the idea that Plaintiffs own the property once they acquire it, the fact remains that they placed orders for the shipment of property in interstate commerce, knowing that upon arrival they would pick up the property and carry it to fulfill the final leg of its interstate travel.  That alone would make Plaintiffs the owners of products carried in fulfillment of a shipper's interstate carriage program, which would bring Plaintiffs within the Secretary's authority to regulate.

And when I further accept that Plaintiffs are the common law employees of Defendants, a finding that is essential to their overtime claims, then perforce they are employed by one or more entities that share an ownership interest in the property being carried to market.  To rule otherwise would mean that an employer of a delivery driver could erect a roadblock to the Secretary's authority by the simple expedient of purporting to transfer title of property to employees while the employees carry the property in a commercial vehicle.[12]  The illogic of that proposition is plain.  The Secretary's jurisdiction over private carriers is not susceptible to manipulation by such artificial devices.

In any event, Plaintiffs asserted at oral argument that the notion of their ownership of the property is fantastical.  When I asked counsel what I should make of the fact that the

---

[12] The DOL Handbook reads:  "The fact that an employee of a private carrier may use his own [commercial] vehicle in transporting property in interstate commerce does not deny an otherwise applicable exemption." Handbook § 24a05(d).  This is a reasonable interpretation of the scope of the Secretary's authority.

distributor agreements purport to transfer ownership to Plaintiffs, counsel responded that the contractual buying and selling described in the Agreements is a fiction.

> THE COURT: So that's a – that's a point that's provided some confusion to me. So let me ask you if you can clarify. Can plaintiffs simultaneously be employees and own the baked goods they transport?
>
> MS. ELLINGSTAD: I don't think so.
>
> THE COURT: All right. And the employment contract indicates plaintiffs buy the products from the defendants before they are transported and sold to third-party customers. Does the assumption that plaintiffs are employees undercut that relationship?
>
> MS. ELLINGSTAD: Yes. I mean, we – we don't believe this – you know, we believe this is just a sham method of, you know, quote, unquote, buying and selling and that they – they don't … buy it.

Transcript of Proceedings at 39 (ECF No. 261).

At the end of the line, assuming Plaintiffs are employees of one or more of the Defendants, they are, necessarily, employed by an entity that shares with its affiliates an ownership interest in the property being transported in interstate commerce. This means the activity is subject to the Secretary's jurisdiction, unless Plaintiffs can prove an exception to the MCA exemption.

### 2.    The TCA Exception

Although Defendants have demonstrated application of the MCA exemption on undisputed evidence, Plaintiffs may still avail themselves of relief under the FLSA to the extent they can prove that a portion of their interstate transportation activity takes place in personals vehicle that weigh 10,000 pounds or less.

Through the Technical Corrections Act ("TCA"), Congress rejiggered the relationship between the Department of Labor and the Department of Transportation in the

following terms:  "Section 7 of the Fair Labor Standards Act of 1938 … shall apply to a covered employee notwithstanding section 13(b)(1) of the Act."   Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU), Pub. L. No. 110-244, § 306(a), 122 Stat. 1572, 1621 (2008).   A "covered employee" is an individual:

(1) who is employed by a motor carrier or private motor carrier …

(2) whose work, in whole or in part, is defined

    (A)  as that of a driver … and

    (B)  as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce … and

(3) who performs duties on motor vehicles weighing 10,000 pounds or less.

*Id.*

In effect, the TCA exception provides that "an employee need only work [in] [lighter] vehicles 'in part' to qualify for overtime compensation, thereby placing drivers of mixed fleets within the FLSA's requirements."  *Schilling v. Schmidt Baking Co.*, *Inc.*, 876 F.3d 596, 601 (4th Cir. 2017).  *See also McMaster v. E. Armored Servs.*, *Inc.*, 780 F.3d 167, 170 – 172 (3d Cir. 2015).[13]  The employee's work in lighter vehicles, however, must still involve interstate transportation.  SAFETEA-LU, Pub. L. No. 110-244, § 306(c)(2)(B) (work must "affect[] the safety of operation of  motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce").  *See also*

---

[13] For a discussion of the treatment courts have given to the mixed fleet scenario *see*, *e.g.*, *Twiddy v. Alfred Nickles Bakery*, *Inc.*, No. 5:14-cv-2053, 2017 WL 1199167, at *4 – 6 (N.D. Ohio Mar. 31, 2017) (collecting cases).

*Garcia v. W. Waste Svcs.*, *Inc.*, 969 F. Supp. 2d 1252 (D. Id.  2013) (finding that the plaintiff did not transport property across state lines when using the personal vehicle and therefore was not a TCA "covered employee").

The First Circuit has not determined how much time an employee must spend operating a vehicle weighing 10,000 pounds or less to maintain entitlement to FLSA overtime under the TCA exception.  The Department of Labor has offered its interpretation that drivers are not exempt from overtime in any work week that they perform "safety affecting duties on a motor vehicle that weighs 10,000 pounds or less."  Department of Labor, Field Assistance Bulletin No. 2010-2 (Nov. 10, 2010).  Based on the bulletin, if an employee spends any amount of time during a regular work week on a vehicle weighing less than 10,000 pounds and is otherwise a covered employee, she or he is entitled to overtime under the TCA exception for that week.

The First Circuit also has not addressed which party has the burden of proving application of the TCA exception to the MCA exemption.  I conclude it is most reasonable to place the burden on Plaintiffs to show that the duties they perform in their personal vehicles are duties affecting interstate commerce, meaning the interstate transportation of property in furtherance of a commercial enterprise.  *Carley v. Crest Pumping Techs.*, *LLC*, 890 F.3d 575, 580 (5th Cir. 2018).

The record supports the finding that at least some of the members of the FLSA class have on occasion driven personal vehicles to deliver interstate products to their customers. In particular, it appears that pull up or recall duties can involve the delivery of products to restock customers' shelves.  Based on this evidence, the finder of fact could conclude,

through an exercise of inferential reasoning, that there are some individuals who will, in some work weeks, use personal vehicles to deliver in-bound products[14] that have traveled in interstate commerce, at that in doing so meet "projections of customer demand that have some factual basis." *Ehrlich*, 767 F. App'x 845, 849 (11th Cir. 2019). Consequently, I am not persuaded by Defendants that the record calls for the entry of *class-wide* summary judgment based on the MCA exemption. However, the record does suggest that summary judgment may well be warranted as to several members of the class, and that proof of the TCA exception is likely to be highly individualized. For example, the record indicates that deliveries in personal vehicles are rare for some distributors (perhaps most – the parties' summary judgment statements and citations do not offer deep insight). This may be due to the fact, attested to by opt-in Plaintiff Curran, that distributors can keep extra product in the back of some larger customers' stores, which they can access during pull ups or recalls.

On January 15, 2019, I issued a Decision and Order (ECF No. 202) that denied Defendants' motion to decertify the FLSA collective action Judge Woodcock certified in his Order of January 20, 2017 (ECF No. 81). As of that writing, my consideration of the certification question was focused primarily on whether the issue of employee status versus independent contractor status was amenable to class-wide proof using representative evidence. I concluded that it was, but I had not yet wrestled with the dispositive issues surrounding application of the MCA exemption and the TCA exception. Having now done

---

[14] Sometimes, individuals will also use personal vehicles to take away expired product. I am not persuaded that the act of carrying stale product away from a store entails transportation of property in interstate commerce. After all, there is no evidence in the record that the removal of expired product involves transportation out of Maine. Rather, the expired product returns to the local warehouse and may find its way to food banks or similar local outlets.

so, I am concerned that application of the TCA exception requires individualized proof, and that a significant number of individuals who have opted-in to the collective action may not have recourse to the TCA exception at all, or else, having recourse to it, will have used personal vehicles only sporadically, not as part of their regular weekly routine.  Even lead Plaintiff Noll's evidence calls into question whether he can take advantage of the week-by-week TCA exception.

"[A]fter a certification order is entered, the judge remains free to modify it in light of subsequent developments in the litigation."  *General Tel. Co. of SW v. Falcon*, 457 U.S. 147, 160 (1982).  For reasons set forth above, although I am not persuaded that it would be appropriate to enter a judgment disposing of the FLSA overtime claims on a class-wide basis, I conclude it is necessary to revisit certification of the FLSA collective given the mixed bag of evidence concerning the TCA exception.

## C.   Plaintiffs' "Penal" Claims

Defendants also move for judgment as a matter of law on Count III and part of Count IV.  In Count III, Plaintiffs claim Defendants misclassified them as independent contractors under 26 M.R.S. § 591-A and ask for "all statutory and equitable remedies to which they are entitled."[15]  Complaint ¶ 72.  One paragraph in Count IV alleges that Defendants failed to keep and preserve accurate time records as required by 26 M.R.S. § 622.  *Id.* ¶ 79.

Maine law presumes that, absent express legislative intent to the contrary, statutes imposing monetary penalties do not simultaneously convey a private right of action.  *See In re Wage Payment Litig.*, 2000 ME 162, ¶ 7, 759 A.2d 217, 222 (Me. 2000).  Starting

---

[15]  Plaintiffs also cite 26 M.R.S. § 1043(11)(E) in the Complaint, but that provision merely provides a statutory definition, not a cause of action.

with Count III, section 591-A states an employer that intentionally or knowingly misclassifies an employee as an independent contractor commits a civil violation for which a fine of not less than $2,000 and not more than $10,000 per violation may be adjudged. 26 M.R.S. § 591-A.  Plaintiff concedes that "section 591-A does not provide for a private right of action."  Pls.'s Opposition at 39.  Therefore, I dismiss Count III because Plaintiffs have failed to state a claim upon which relief can be granted.  *See Wawenock, LLC v. Dep't of Transp.,* 2018 ME 83, ¶ 27, 187 A.3d 609, 621 (holding judgment on the pleadings was appropriate where there was no private right of action under Maine law).

Defendants' reliance on section 622 in Count IV is likewise barred because the law does not give Plaintiffs a private right of action.  Section 622 provides for a forfeiture of $100 to $500 for each violation, but it does not convey a private right of action to Plaintiffs. It "is the type of civil violation that is solely enforceable by the Attorney General unless otherwise specified."  *In re Wage Payment Litig*., 759 A.2d 217, 222 (Me. 2000); *see also In re Wal-Mart Wage & Hour Employment Practices Litig.*, 490 F. Supp. 2d 1091, 1131 (D. Nev. 2007) (finding that, "[p]ursuant to § 626–A, only the Maine Department of Labor may pursue civil forfeiture penalties against an employer for violating § 622.").  Because section 622 does not confer a private right of action on Plaintiffs, I likewise grant judgment

in favor of Defendants to the extent Plaintiffs were seeking any monetary relief under section 622 in Count IV.

**D.     Remaining Issues**

I resolve the remaining issues in summary fashion:

The preemption challenge based on the Federal Aviation Administration Authorization Act of 1994 is a non-starter for the reasons Judge Torresen set forth in *Venegas v. Global Aircraft Service, Inc.*, No. 2:14-CV-249-NT, 2016 WL 5349723, at *18 (D. Me. Sept. 23, 2016).

Mr. Degen's participation in this matter is not foreclosed for the reasons Magistrate Judge Cohen set forth in his recommended decision in *Goode v. Signet Electronic Systems, Inc.*, No. 2:06-CV-65, 2006 WL 1636066, at *4 (D. Me. June 8, 2006).

Mr. Temm's participation in this matter is not foreclosed by judicial estoppel because the record does not demonstrate he manipulated or misled the courts.

It is not appropriate, at this time, on this record, to declare that Plaintiffs are entitled to the three-year FLSA statute of limitations or liquidated damages.

**CONCLUSION**

Plaintiffs' Motion for Partial Summary Judgment (ECF No. 230) is **DENIED.** Defendants' Motion for Partial Summary Judgment (ECF No. 224) is **GRANTED IN PART** and **DENIED IN PART**.   Defendants' request for judgment as to the state law claims asserted in Counts II, III and IV is **GRANTED**.  More specifically, Count III and that portion of Count IV that requests relief pursuant to 26 M.R.S. § 622 are **DISMISSED WITH PREJUDICE**.  As to the remainder of Count IV, Defendants are granted summary

judgment pursuant to the Maine outside sales exemption.  Defendants' request for summary judgment as to the FLSA collective claim in Count I is **DENIED**.  In addition, the federal declaratory judgment claim in Count II will remain, pending resolution of Count I.

Defendants are hereby granted leave to file a motion to decertify the FLSA collective action, but only as regards the TCA exception to the MCA exemption.  The Court will establish a schedule for briefing the motion in a forthcoming telephone conference.

**SO ORDERED.**

Dated this 29th day of January, 2020.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE